**From:** Jim Courtovich <jimc@sphereconsulting.com>
**Date:** Wednesday, 25 February 2015 15:12
**To:** Simon Charlton <scharlton@ahalgosaibi.com>
**Subject:** lein

Simon,

The WoodlandRE LLC will need to have one person, just by name, identified as the signor of the lein against the property...so it should be a person, even a clerk, at one of your law firms. They have no power, as the investors will own the vehicle. It assures confidentiality as well as securing rights through a UCC filing.

Jim



PLAINTIFF'S
EXHIBIT
A

**From:** Jim Courtovich <jimc@sphereconsulting.com>
**Date:** Friday, March 18, 2016 at 15:11
**To:** Simon Charlton <scharlton@ahalgosaibi.com>, Graham Miller <graham@sphereconsulting.com>
**Cc:** Brett Walter <bwalter@ahalgosaibi.com>
**Subject:** Re: SGR

We are redoing the financials based on the restructuring the the payment of $1 million later this month. We are going to start to begin monthly payments close to the initial items outlined in the beginning. Clearly we did not expect the initial client who had a rather massive project for us to shoot himself in the head and that coupled with the slow-down in lobbying in general just around the time we launched. That said, though there will be initial delay in the client side, we have the ability get back on track and meet our terms in short order.

As for the signature on the house, we would like to wait just a few more months. We have cleared the hurdle of the cease order on the house based on neighbors complained that we were running a business out of there. We had the cease order pulled in a few days but still wanted to be careful, that is why I offered you to put a hold on woodland drive in the interim, so you could have your collateral and we could get past a small bump with the lovely neighbors of capitol hill. What we are doing is perfectly legal there, just want to get it all squared without making it into the washing on post.

**From:** Simon Charlton <scharlton@ahalgosaibi.com>
**Date:** Friday, March 18, 2016 at 6:37 AM
**To:** James Courtovich <jimc@sphereconsulting.com>, Graham Miller <graham@sphereconsulting.com>
**Cc:** Brett Walter <bwalter@ahalgosaibi.com>
**Subject:** SGR

Gents

I am going to have to report to my Board on the development of SGR.

I am checking my files and note the following.

Woodland has been incorporated but it does not yet have a security interest in the property. We do need to do this as a matter of urgency so could you advise how w move this forward.

I don't believe we ever had a countersigned MOU which is fine as we moved on to actual documentation.

I have copies of the following:

1.  Operating agreement SGR
2.  Member Control Agreement
3.  Security Agreement

Each of these I have signed on behalf of Woodland but I do not have anything countersigned by you. Is this something we can do?

We then need to deal with what is the way forward.



PLAINTIFF'S EXHIBIT

6

I won't get into it here but as we were when we invested a year ago we remain committed to and like this investment and want to pursue it and see it work.

The initial aim was to invest approximately half of the money in the property (clause 4.2.3) (ultimately a little more than that was invested which is fine) with the other half to be used for working Capital and either bringing in individuals or a team or buying an existing business. Obviously this has not happened.

In addition under the terms of the MOU and the agreements interest is due from inception at 8% per annum on the funds invested in the real estate and 12% per annum on the balance (Clause 4.4). If we work of an equal split this is an average of 10% per annum or approximately US $400,000 per annum. Obviously none has been paid. I am happy to agree a waiving of interest up to the point when the house became operational as that would seem reasonable and we should have foreseen that. We need to agree an effective date and then how the interest shall be treated/accounted for and or paid.

Do we have financials as 31 December – is that the accounting year end date?

We then need to agree how we move forward and would appreciate your views on what the options are?

Best regards

Simon

**Simon Charlton**
Chief Restructuring Officer
Acting Chief Executive Officer
**Ahmad Hamad Al Gosaibi & Bros**
Mobile: + 966 55 677 0200
Dubai: + 971 50 712 4719
USA: +1 202 294 2640
scharlton@ahalgosaibi.com

This e-mail may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments. In any event please consider the environment before printing. Thank you.

Sunday, March 15, 2020 at 8:34:15 PM Arabian Standard Time

**Subject:** Re: Woodland and SGR

**Date:** Thursday, 28 May 2015 at 17:06:52 Arabian Standard Time

**From:** Jim Courtovich

**To:** Simon Charlton, Graham Miller

**CC:** Brett Walter

MorningŠ

Let me check with Graham on the paperwork, I assumed it had been electronically signed by Kim. Graham can you detail where it is and is it final? We should get this signed asap.

As for the hiring, we started a few months late so I can update the timing but no major changes. We are aggressively looking for the right people but at the same time also seeking new clients. I think we will have two signed in a week or so and Genentech by early summer. But let's talk in detail with updated budgets, nothing has been spent other than the house and kitchen items. The kitchen plan is being finalized and will be put in July/August with Sept 1 being the big launch of the house.

I am on a train to NYC now and Graham is with his Kentucky Family in France, clearly with fanny packs. I will connect with him by email and see where the paperwork is.

Jim

---

**From:** Simon Charlton <scharlton@ahalgosaibi.com>
**Date:** Thursday, May 28, 2015 at 3:12 AM
**To:** James C <jimc@sphereconsulting.com>, Graham Miller <graham@sphereconsulting.com>
**Cc:** Brett Walter <bwalter@ahalgosaibi.com>
**Subject:** Woodland and SGR

Gents

It has been a couple of months since we really exchanged anything on SGR paperwork.

I know John Caldwell advised there wasn't much to it but he wanted to speak with Jim about income streams etc. Not sure if he did that.

I had signed the documents back in late February or early March I think, but we don't have anything signed back.

I also do not think that the Delaware corporation, Woodland, was established.

I know we have the property which is great but it would be good for me to get a bit of an understanding of the plans for that and the hiring and how we move forward.

I know the next week or two we are all very busy. But I am planning on being in DC for a week or so at the start of Ramadan so perhaps we could set aside some time then for me to get some understanding and also to agree and isgn term sheet and underlying documentation.

Many thanks

Best regards

Simon

**Simon Charlton**
Chief Restructuring Officer
Acting Chief Executive Officer
**Ahmad Hamad Al Gosaibi & Bros**
Mobile: + 966 55 677 0200
Dubai: + 971 50 712 4719
USA: +1 202 294 2640
scharlton@ahalgosaibi.com



PLAINTIFF'S
EXHIBIT
6

**From:** Graham Miller <graham@sphereconsulting.com>
**Date:** Thursday, May 12, 2016 at 19:20
**To:** Simon Charlton <scharlton@ahalgosaibi.com>
**Subject:** Signed SGR Documents

Simon,

Jim asked that I send these signed documents to you.  Please see them attached for your review.

Look forward to catching up soon.

-Graham



PLAINTIFF'S
EXHIBIT

## SECURITY AGREEMENT

**DATED:** _____, 2016

**EFFECTIVE DATE:** March 9, 2015

**SECURED PARTY:** Woodland Drive LLC ("**Investor**")

**GRANTOR:** James Courtovich ("**Courtovich**")

### BACKGROUND:

Investor has invested Four Million Dollars ($4,000,000) ("**Loan**") for the benefit of S.G.R. LLC, Government Relations and Lobbying, a Delaware limited liability company (the "**Company**"). Investor has agreed that approximately Two Million Dollars ($2,000,000) of the Loan ("**Real Estate Loan**") shall be used to purchase real estate in Washington, D.C. (the "**Real Estate**") in the name of Courtovich as evidenced by the Operating Agreement of the Company, effective as of January 1, 2015 (the "**Operating Agreement**")

Courtovich agrees to grant Investor a security interest in the Real Estate to secure the performance and observation by Company of all of the covenants, obligations, representations and warranties related to the Real Estate Loan, evidenced by the Operating Agreement and by this Security Agreement (collectively referred to herein as the "**Obligations**").

### AGREEMENTS:

In consideration of the premises and mutual covenants and promises contained herein, the parties named above agree as follows:

1. <u>Application of UCC.</u> "**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the District of Columbia; *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Investor's security interest in any "**Collateral**" (as defined in Section 2 below) is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the District of Columbia, the term "**UCC**" shall mean the Uniform Commercial Code as in effect at such time in such other jurisdiction for purposes of the provisions hereof. Unless otherwise defined in this Security Agreement, all terms defined in the Uniform Commercial Code and used herein shall have the same definitions herein as specified therein whether or not such term is capitalized. Filing to take place on August 1, 2016.

2. <u>Grant of Security Interest.</u> In order to secure payment and performance of the Obligations, Courtovich hereby grants to Investor a security interest in the Real Estate (referred to herein as the "**Collateral**").

NAI-783212655v3

3.  <u>Courtovich's Representations, Warranties and Covenants.</u> Courtovich represents, warrants and covenants that:

a.  Courtovich has full power and authority to execute this Security Agreement and to subject the Collateral to the security interest created hereby;

b.  This Security Agreement and the Operating Agreement have been duly authorized by all necessary action;

c.  Courtovich authorizes Investor to file at any time, and from time to time, financing statements and amendments thereto or other similar instruments, and perform such acts as Investor reasonably may request to establish and maintain a valid and properly perfected security interest in the Collateral;

d.  Courtovich will keep accurate and complete records of the Collateral at all times and permit Investor to inspect the records and the Collateral at all reasonable times. Upon request of Investor, Courtovich will furnish such reports and statements as Investor reasonably may request with respect to the Collateral; and

4.  <u>Other Covenants of Courtovich.</u> So long as any of the Obligations, including under the Operating Agreement or this Security Agreement or any part thereof, remains unpaid or unperformed, Courtovich further covenants and agrees that:

a.  Courtovich shall not sell or otherwise transfer or dispose of the Collateral without prior notice to and consent of the Investor;

b.  Courtovich shall promptly pay all taxes and other governmental charges' levied or assessed upon or against any Collateral;

c.  Courtovich shall keep the Collateral free and clear from all claims, liens or encumbrances, except for the security interest granted hereby or otherwise consented to by Investor; and

5.  <u>Events of Default.</u> Courtovich shall be in default under this Security Agreement upon the happening of any of the following events (each an "**Event of Default**"):

a.  Any representation or warranty made by Courtovich in this Security Agreement proves to be materially false or misleading;

b.  Courtovich materially breaches any of his other covenants, obligations or duties under this Security Agreement and such default remains uncured after the expiration of any cure period, if applicable, following written notice of such default if required;

2

c. Courtovich files a petition in bankruptcy, insolvency or receivership; or if such petition is filed against Courtovich and is not dismissed within thirty (30) days of filing; or if Courtovich makes an assignment for the benefit of creditors; or

d. A garnishment, summons or a writ of attachment is issued against or served upon Investor regarding the attachment of any property of Courtovich or any indebtedness owing to Courtovich and is not dismissed within thirty (30) days of filing or otherwise consented to by Investor.

6. Remedies Upon Default. Upon the occurrence of an Event of Default as set forth in the preceding paragraph and such Event of Default remains uncured after the applicable cure period following written notice of default, Investor may exercise any and all of the following remedies provided hereunder or under applicable law. No exercise of any one or more of such remedies shall preclude Investor from exercising any other such remedy at the same time or any other time. Investor may:

a. Declare the balance of Real Estate Loan to be paid under the Operating Agreement, to be due and payable immediately; and

b. Exercise any and all of the remedies of a Investor under the Uniform Commercial Code with respect to the Collateral, including the right to offer and sell the Collateral privately to purchasers. If notice to Courtovich is required by law in a particular instance, such notice shall be deemed to be commercially reasonable if given at least ten (10) calendar days prior to the date of the intended disposition or other action. Courtovich will pay any deficiency that may remain after exercise of such rights. All of Investor's rights hereunder are cumulative and no waiver of any default shall affect any subsequent default.

7. No Waiver. Waiver by Investor of any default of Courtovich hereunder shall not be a waiver of any default or of the same default on a later occasion. No delay or failure by Investor to exercise any right or remedy shall be a waiver of such right or remedy. No single or partial exercise by Investor of any right or remedy shall preclude other or further exercise of such right or remedy at any other time.

8. Notices. All notices to be given to Courtovich shall be deemed sufficiently given if delivered by courier, or mailed, emailed or faxed with receipt acknowledged, to Courtovich at the most recent address shown on Investor's records.

10. Survival. All representations, warranties and covenants contained in this Security Agreement shall survive the execution, delivery and performance of this Security Agreement and the creation and payment of the Obligations.

11. Modification. No waiver, modification, amendment or termination of this Security Agreement or any provision hereof shall be effective unless contained in a writing signed by the party to be bound thereby.

3

NAI-783212655v3

12. <u>Successors and Assigns</u>. This Security Agreement shall be binding upon and inure to the benefit of Courtovich and Investor and their respective heirs, representatives, successors and assigns.

13. <u>Applicable Law</u>. This Security Agreement and all rights and obligations hereunder shall be governed by and interpreted under the laws of the State of Delaware, without application of any choice of law considerations.

14. <u>Entire Security Agreement.</u> This Security Agreement represents the only agreement among the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, relating thereto. Copies of this Security Agreement with signatures transmitted electronically (e.g., by facsimile or pdf) shall be deemed to be original signed versions of this Security Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the Effective Date.

**GRANTOR**

JAMES COURTOVICH

By: _____

**SECURED PARTY**

WOODLAND DRIVE LLC

By: _____

Name:  Simon Charlton

Title:  Manager

NAI-783212655v3

5

## MEMBER CONTROL AGREEMENT

This MEMBER CONTROL AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of _____, 2016, and effective as of May 1, 2016 ("Effective Date") between Sphere Consulting LLC ("**Sphere**"), Woodland Drive LLC (the "**Investor**"), and other Persons that become Members from time to time (collectively, the "**Members**"), and S.G.R. LLC, Government Relations and Lobbying, a Delaware limited liability company (the "**Company**").

## RECITALS

**WHEREAS**, the Members have incorporated the Company for the purposes of establishing a business or multiple businesses;

**WHEREAS**, the Members have entered into that certain Operating Agreement of S.G.R. LLC, Government Relations and Lobbying, effective as of May 1, 2016 (the "**Operating Agreement**"), and the Units of the Company are owned in the percentages stated in the Schedules to the Operating Agreement, as such may be adjusted or amended from time to time; and

**WHEREAS**, the Members and the Company hereby agree that this Agreement shall govern the rights of the Members related to the Units and shall govern certain other matters as set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.    <u>Definitions</u>. For purposes of this Agreement:

1.1    "**Board**" means the Company's board of directors.

1.2    "**Certificate**" means the Certificate of Formation of the Company, as filed with the Secretary of State of the State of Delaware, as the same may be amended from time to time.

1.3    "**Company Notice**" means written notice from the Company notifying the selling Member that the Company intends to exercise its Right of First Refusal as to some or all of the Units with respect to any Proposed Transfer.

1.4    "**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly) Units, including options and warrants.

1.5    "**Fair Market Value**" means the fair market value as determined by an independent appraiser selected by the Board.

1.6    "**Fully Exercising Member**" has the meaning set forth in <u>Section 3.1(b)</u>.

1.7    "**Immediate Family Member**" means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, domestic partner, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, of a natural person referred to herein.

1.8    "**Incentive Units Plan**" means an incentive Units plan to be adopted in the future by the Board for the benefit of the Company's employees.

1.9    "**Member Notice**" means written notice from a Member notifying the Company and the selling Member that such Member intends to exercise its Secondary Refusal Right as to a portion of the Units with respect to any Proposed Transfer.

1.10    "**New Securities**" means, collectively, equity securities of the Company issued after the date hereof, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities; provided, however, that Derivative Securities and Units granted or sold to employees, directors and bona fide consultants and Derivative Securities and Units granted under any incentive plan (including the Incentive Units Plan) of the Company are not New Securities.

1.11    "**Offer Notice**" has the meaning set forth in Section 3.1(a).

1.12    "**Participating Member**" means any Member exercising its Secondary Refusal Right or Tag Along Right, as applicable.

1.13    "**Person**" means any individual, company, partnership, trust, limited liability company, association or other entity.

1.14    "**Proposed Transfer**" means any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering of any Units (or any interest therein) proposed by any of the Members.

1.15    "**Proposed Transfer Notice**" means written notice from a Member setting forth the terms and conditions of a Proposed Transfer.

1.16    "**Prospective Transferee**" means any person to whom a Member proposes to make a Proposed Transfer.

1.17    "**Proposed Sale**" has the meaning set forth in Section 4.2.

1.18    "**Right of First Refusal**" means the right, but not an obligation, of the Company, or its permitted transferees or assigns, to purchase some or all of the Units with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

1.19    "**Sale of the Company**" has the meaning set forth in Section 4.1.

2

1.20  "**Secondary Notice**" means written notice from the Company notifying the Members that the Company does not intend to exercise its Right of First Refusal as to the Units with respect to any Proposed Transfer.

1.21  "**Secondary Notice Period**" has the meaning set forth in Section 2.1(c).

1.22  "**Secondary Refusal Right**" means the right, but not an obligation, of each non-transferring Member to purchase up to its pro rata portion (based upon the total number of Units then held by all non-transferring Members) of any Units not purchased pursuant to the Right of First Refusal, on the terms and conditions specified in the Proposed Transfer Notice.

1.23  "**Selling Members**" has the meaning set forth in Section 4.1.

1.24  "**Tag Along Right**" means the right, but not an obligation, of a Member to participate in a Proposed Transfer on the terms and conditions specified in the Proposed Transfer Notice, if such a Proposed Transfer would result in more than fifty percent (50%) of the Units being sold to a Prospective Transferee.

1.25  "**Tag Along Notice**" has the meaning set forth in Section 2.2(a).

1.26  "**Units**" means limited liability company membership interests owned by the Members, or issued to a Member after the Effective Date.

2.  Agreement Among the Company and the Members.

2.1  Right of First Refusal.

(a)  Grant.  Subject to the terms of Section 2.4 below, each Member hereby unconditionally and irrevocably grants to the Company a Right of First Refusal to purchase all or any portion of Units that such Member may propose to transfer in a Proposed Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.

(b)  Notice.  Each Member proposing to make a Proposed Transfer must deliver a Proposed Transfer Notice to the Company and to each other Member.  Such Proposed Transfer Notice shall contain the material terms and conditions (including price and form of consideration) of the Proposed Transfer and the identity of the Prospective Transferee. To exercise its Right of First Refusal under this Section 2.1, the Company must deliver a Company Notice to the selling Member within fifteen (15) days after delivery of the Proposed Transfer Notice.

(c)  Grant of Secondary Refusal Right.  Subject to the terms of Section 3 below, each Member hereby unconditionally and irrevocably grants to the other Members a Secondary Refusal Right to purchase all or any portion of the Units not purchased by the Company pursuant to its Right of First Refusal, as provided in this Section 2.1(c).  If the Company does not intend to exercise its Right of First Refusal with respect to all Units subject to a Proposed Transfer, the Company must deliver a Secondary Notice to each Member no later than twenty (20) days after the selling Member delivers the Proposed Transfer Notice to the

3

Company. To exercise its Secondary Refusal Right, a Participating Member must deliver a Member Notice to the other Members and the Company no later than thirty (30) days after the Company delivers the Secondary Notice to the Member (the "**Secondary Notice Period**").

(d)    Consideration; Closing. If the consideration proposed to be paid by the Prospective Transferee for the Units is in property, services or other non-cash consideration, the Fair Market Value of the consideration shall be as determined in good faith by the Board and as set forth in the Company Notice. If the Company or any Participating Member cannot for any reason pay for the Units in the same form of non-cash consideration, the Company or such Member may pay the cash value equivalent thereof as set forth in the Company Notice. The closing of the purchase of Units by the Company and the Participating Members shall take place, and all payments from the Company and the Participating Members shall have been delivered to the selling Member, by no later than ninety (90) days after delivery of the Proposed Transfer Notice.

2.2    Tag Along Right.

(a)    Exercise of Right. If any Units subject to a Proposed Transfer is not purchased pursuant to Section 2.1 above and if such a Proposed Transfer would result in more than fifty percent (50%) of the Units being sold to a Prospective Transferee, any other Member may elect to exercise its Tag Along Right and participate on a pro rata basis in the Proposed Transfer on the same terms and conditions specified in the Proposed Transfer Notice. Each Member who desires to exercise its Tag Along Right must give the selling Member written notice to that effect (a "**Tag Along Notice**") within fifteen (15) days after the deadline for delivery of the Secondary Notice described above, and upon giving such notice such Member shall be deemed to have effectively exercised its Tag Along Right.

(b)    Purchase and Sale Agreement. The Members hereby agree that the terms and conditions of any sale pursuant to this Section 2.2 will be memorialized in, and governed by, a written purchase and sale agreement with customary terms and provisions for such a transaction and the Members further covenant and agree to enter into such an agreement as a condition precedent to any sale or other transfer pursuant to this Section 2.2.

2.3    Additional Compliance.

(c)    Additional Compliance. If any Proposed Transfer is not consummated within ninety (90) days after receipt of the Proposed Transfer Notice by the Company, the Members proposing the Proposed Transfer may not sell any Units unless they again first comply in full with each provision of Section 2.1. The exercise or election not to exercise any right by any non-transferring Member under Section 2.1 shall not adversely affect its right to participate in any other sales of Units subject to Section 2.2.

(a)    Transfer Void; Equitable Relief. Any Proposed Transfer not made in compliance with the requirements of this Agreement shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company. Each Member hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other Members hereto for which monetary damages alone

4

could not adequately compensate.   Therefore, the Members hereto unconditionally and irrevocably agree that any non-breaching Member hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Units not made in strict compliance with this Agreement).

2.4     Exempted Transfers.  Notwithstanding the foregoing or anything to the contrary herein, the provisions of Sections 2.1 and 2.2 shall not apply:   (a) in the case of a Member that is an entity, upon a transfer by such Member to its members, partners or other equity holders, or (b) in the case of a Member that is a natural person, upon a transfer of Units by such Member made for bona fide estate planning purposes, either during his or her lifetime or on death by will or intestacy to his or her Immediate Family Members, or any other relative approved by the Board, or any custodian or trustee of any trust, partnership or limited liability company for the benefit of, or the ownership interests of which are owned wholly by, such Member or any such Immediate Family Members, provided that in the case of clause(s) (a) or (b), the Member shall deliver prior written notice to the other Members of such pledge, gift or transfer and such Units shall at all times remain subject to the terms and restrictions set forth in this Agreement and such transferee shall, as a condition to such issuance, deliver a counterpart signature page to this Agreement as confirmation that such transferee shall be bound by all the terms and conditions of this Agreement as a Member (but only with respect to the securities so transferred to the transferee), including the obligations of a Member with respect to Proposed Transfers of such Units pursuant to Section 2.1 and Section 2.2; and provided, further, in the case of any transfer pursuant to clause (a) or (b) above, that such transfer is made pursuant to a transaction in which there is no consideration actually paid for such transfer.

2.5     Exempted Offerings.  Notwithstanding the foregoing or anything to the contrary herein, the provisions of Section 2.1 and Section 2.2 shall not apply to the sale of any Units that constitute a Sale of the Company.

3.     Rights to Future Units Issuances.

3.1     Right of First Offer.   Subject to the terms and conditions of this Section 3.1 and applicable securities laws, if the Company proposes to offer or sell any New Securities (other than a dividend on outstanding Units), the Company shall first offer all such New Securities to each Member.  A Member shall be entitled to apportion the right to purchase such New Securities hereby granted to that Member.

(a)     The Company shall give notice (the "**Offer Notice**") to each Member, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

(b)     By notification to the Company within twenty (20) days after the Offer Notice is given, each Member may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Units issued and held by such Member bears to the total Units of the Company then outstanding held by the Members.  At the expiration of such twenty (20) day

5

period, the Company shall promptly notify each Member that elects to purchase or acquire all the Units available to it (each, a "**Fully Exercising Member**") of any other Member's failure to do likewise. During the ten (10) day period commencing after the Company has given such notice, each Fully Exercising Member may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of Units specified above, up to that portion of the New Securities for which the other Members were entitled to subscribe. The closing of any sale pursuant to this Section 3.1(b) shall occur within the later of ninety (90) days of the date that the Offer Notice is given or the date of initial sale of New Securities pursuant to Section 3.1(c).

(c)     If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in Section 3.1(b), the Company may, during the ninety (90) day period following the expiration of the periods provided in Section 3.1(b), offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within thirty (30) days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the Members in accordance with this Section 3.1.

4.     Drag-Along Right.

4.1     Actions to be Taken. In the event that the holders of more than seventy-five percent (75%) of the Units propose to sell their Units (the "**Selling Members**"), and such sale is conditioned upon the sale of the remaining Units of the Company ("**Sale of the Company**"), then each Member hereby agrees:

(a)     to sell the Units beneficially held by such Member to the Person to whom the Selling Members propose to sell their Units, and, except as permitted in Section 4.2 below, on the same terms and conditions as the Selling Members; and

(c)     to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Selling Members in order to carry out the terms and provision of this Section 4.1, including without limitation executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, and any similar or related documents.

4.2     Exceptions. Notwithstanding the foregoing, a Member will not be required to comply with Section 4.1 above in connection with any proposed Sale of the Company (the "**Proposed Sale**") unless:

(a)     the Member shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the

6

NAI-78321224.5v3

Company as well as breach by any Member of any of identical representations, warranties and covenants provided by all Members);

(b)    liability shall be limited to such Member's applicable percentage Units, except with respect to claims related to fraud or intentional misrepresentation;

(c)    upon the consummation of the Proposed Sale, each holder of Units will receive the same form of consideration for their Units as is received by other holders in respect of their Units; and

(d)    subject to clause (c) above, if any holders of any Units of the Company are given an option as to the form and amount of consideration to be received as a result of the Proposed Sale, all holders of Units will be given the same option.

5.    Miscellaneous.

5.1    Successors and Assigns. Other than as set forth in this Section 5.1, no party to this Agreement may assign this Agreement without the written consent of the other parties. The rights under this Agreement may be assigned (but only with all related obligations) in accordance with Section 2.4. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

5.2    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

5.3    Counterparts; Facsimile. This Agreement may be executed and delivered by facsimile or electronically, in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.4    Headings. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

5.5    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the addresses, email addresses, or facsimile numbers provided from time to time.

7

NAI-783212245v3

5.6    Amendments and Waivers.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and each of the Members; provided that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party.  No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

5.7    Severability.  In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

5.8    Additional Members.  Notwithstanding anything to the contrary contained herein, if the Company issues additional Units after the date hereof, whether pursuant to a subscription agreement or otherwise, any purchaser of such Units may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed a "Member" for all purposes hereunder.  No action or consent by the Members shall be required for such joinder to this Agreement by such additional Member, so long as such additional Member has agreed in writing to be bound by all of the obligations as a "Member" hereunder.

5.9    Recitals.  The recitals of this Agreement are incorporated into and made part of the terms of this Agreement.

5.10    Entire Agreement.  This Agreement constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

**[Remainder of Page Intentionally Left Blank]**

NAI-783212245v3

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**COMPANY**

S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING

By: _____

Name:  James Courtovich

Title:  Chief Executive Officer

**MEMBERS**

SPHERE CONSULTING LLC

By: _____

Name:  James Courtovich

Title:  Managing Partner

WOODLAND DRIVE LLC

By: _____

Name:  Simon Charlton

Title:  Manager

NAI-783212245v3