

**Planet Depos**

We Make It *Happen*™

# Transcript of James Courtovich

**Date:** January 27, 2023
**Case:** Woodland Drive, LLC -v- Courtovich

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x

WOODLAND DRIVE LLC,          :

           Plaintiff,        :

   v.                        :      Case No.

JAMES COURTOVICH,            :      1:19-cv-00750-RJL

           Defendant.        :

- - - - - - - - - - - - - x

Deposition of JAMES COURTOVICH

Washington, D.C.

Friday, February 3, 2023

9:01 a.m.

Job No.: 479094

Pages: 1 - 162

Transcribed By: Janice Willier

Exhibit A

BY MR. COOK:

Q  Mr. Courtovich, I'm going to hand you a document and if you don't mind taking a few minutes to review it and to refresh your recollection as to what that document is.  This is Exhibit 2.

(Thereupon, Exhibit 2 was marked for identification.)

A  Thank you.

Q  I guess we'll call these Courtovich 2 as opposed to -- yesterday's Charlton 2.  So this appears to me to be an email from you to Mr. Charlton dated December 4, 2014.  What is this document?

A  It was just kind of the rough plan going into working on expanding the company.

Q  Got it.  So is this your, in essence, first kind of term sheet as what you're proposing the deal?

A  I can't say if it's the first or the second or the third.

Q  Yeah.

Exhibit A

A   It all stemmed from an earlier conversation when they had asked if we would take a position in the family's assets in Great Britain to protect them against collection from HSBC.  And that's what we declined on that.  But we started to talk about -- go back and forth on rough sketches on what to do --

Q   Who's they?

A   Simon and his advisors.

Q   And which advisors were those?

A   Eric Lewis and -- I can't remember everyone.

Q   Okay.

A   I think Andy Ford.

Q   Right.  So is this -- what you reflect in Exhibit 2, you know, before you -- is this the first iteration, or second or third as you say, of what your proposing to Simon as to what the deal may be?

A   It's the beginning of a conversation.

Q   Right.  Okay.  All right.  And I just want to go through some of this here.  You -- in the

Exhibit A

Transcript of James Courtovich
January 27, 2023                                              14

identification.)

MR. DUNCAN:  You're going to get in your steps today.

MS. HOPKIN:  That's the goal.

MR. DUNCAN:  Andy takes care of his people.

MR. COOK:  What's that?

MR. DUNCAN:  You take care of your people.

MR. COOK:  Right, right, right.

BY MR. COOK:

Q  Mr. Courtovich, can you take a moment to review that document?

A  Mm-hmm.

Q  What is your understanding of Simon's email to you?

A  That the board seems to support the idea.

Q  Okay.  What board is that?

A  The Al Gosaibi board of directors.

Q  Okay.  Thank you.

MR. COOK:  Okay.  Tara, tab four, Exhibit 4?

(Thereupon, Exhibit 4 was marked for

Exhibit A

identification.)

A  Thank you.

Q  Mr. Courtovich, can you take a moment to review that document.  Can you tell us what Exhibit -- sorry, Exhibit 4 is?

A  It was a document created by Jones Day, an investment agreement, that was rejected by Simon.

Q  On what basis would it be rejected?

A  I don't remember his reasoning.

Q  Okay.  All right.  But so this -- this is the -- a term sheet that your counsel --

A  Correct.

Q  -- prepared in follow-up to your December 4 email; is that correct?  Putting into a term sheet what you were proposing in terms of an agreement, correct?

A  Correct.

Q  Yeah, okay.  Great.  So I just want to go through the term sheet here, if we might.  And this term -- the email and the attached term sheet on Exhibit 4 -- in Exhibit 4 was sent February 14, 2015 by Graham Miller.  And Graham Miller works in

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    16

your office?

     A   Correct.

     Q   And it was sent to you and Simon, correct?

     A   Right.

     Q   So this was sent before you sent the money -- received the money, correct?  If you're uncertain, we'll go through that in a minute.

     A   Okay.

     Q   Okay.  All right.  So I want to turn your attention to page 2 of the term sheet.  And I want to -- I want to focus your attention halfway down the page in the section that's headed Interest Real Estate Security.  For purposes of the record, this is a Woodland production 3375.  Do you see that reference to Interest Real Estate Security --

     A   Mm-hmm.

     Q   -- as a heading?  And it says, any allocation under real estate will be repaid at an interest rate -- excuse me -- at an eight percent interest rate, correct?

     A   That's what it says but this document was rejected so --

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    17

Q   Okay.  But this is your term sheet that you forwarded to Simon.  Or your --

A   Correct.

Q   Correct.  Yeah.  Right.  Okay, great.  And it also says, the remaining loan, which will be allocated to the company's operations, will be paid at a 12 percent interest rate; is that not correct?

A   Yes.

Q   Okay.  Great.  Further down the page, the same page, it says, number of units -- excuse me -- percentage ownership.  The investors shall receive units which shall comprise 49 percent of the equity of the company, correct?

A   Correct.

Q   And that was your intention?

A   On this document.

Q   On this document?

A   Yeah.

Q   Okay.  Great.  Terrific.  Let me shift your attention to page 3 of the term sheet.  In the heading it says, Rights, Preferences,

Exhibit A

Transcript of James Courtovich
January 27, 2023                    19

A  Correct.  It says that.

Q  Okay.  Let me turn your attention to what will be marked as Exhibit 5.

(Thereupon, Exhibit 5 was marked for identification.)

Was that the same one -- yup.  Excuse me. Mr. Courtovich, take your time to review what's been handed to you as Exhibit 5.

A  Mm-hmm.

Q  Okay.  First, I'd like to -- to focus your attention at the bottom of Woodland page 3361. And it's your email to Graham and to Simon -- Graham Miller and Simon Charlton, right?

A  Mm-hmm.

Q  And in there you say -- I want to make sure the real estate documents are in place and agreed upon ASAP as we want to move on the property as soon as the investors approve the overall transaction, right?  Can you talk to me about what's happening when you're writing this email and what your concern is there?

A  I have no recollection.

Exhibit A

Q  Okay.  Was there a people -- a particular piece of property you were interested in or why were you requesting that things move quickly?

A  I --

Q  You don't remember?

A  I have no memory of that.

Q  Okay.  All right.  Now, we were just talking about the term sheet --

A  The rejected term sheet.

Q  As you wish to categorize the term sheet. And on the top of page 33 -- Woodland page 3361, which is Exhibit 5, you say, these terms are fine as they will build all other documents on them, correct?  So you were in agreement with the terms in the term sheet?  They were fine with you, correct?

A  It was such a flow, back and forth.  I can't think of a time we ever had an agreement or something that was confirmed by both parties.

Q  Okay, well -- but all I'm asking you about is your particular email.

A  Mm-hmm.

Exhibit A

Transcript of James Courtovich
January 27, 2023                                          23

Q  What do you have in writing that the term sheet was rejected?

A  I think them coming back with a different term sheet was the representation that it was rejected.  Because they went to their counsel and had it completely rewritten.

Q  Okay.  All right.  Let me turn you to what's been identified as -- or will be identified as Exhibit 6.

(Thereupon, Exhibit 6 was marked for identification.)

A  Thank you.

Q  Mr. Courtovich, can you review what's been handed to you as Exhibit 6 and identify for the record what that document is?

A  Operating agreement.

Q  I'm sorry, it's kind of a series of documents, right?

A  Well, they're emails and it says operating -- this is more.

Q  So --

A  Yeah.  Operating agreement, member control

Exhibit A

agreement, subscription agreement, security agreement.

Q  Right.  Okay.  Sure.  So in your statement in Exhibit 5 you say, so these terms are fine, we'll build all the other documents on them.  And that was an email dated February 15th.  So February 26th we have this suite of documents. Are these the documents that you were referring to -- Exhibit 6, are these the documents you were referring to in Exhibit 5 when you say, as they will build all other documents on them?

A  So are these the documents written by Jones Day?

Q  Well, these are coming from you and Graham Miller so --

A  Okay.  So again, these are -- all the Jones Day documents were rejected.  So that goes into this as well.

Q  Well, but these are the -- these are the terms that you were proposing to for the deal?

A  Yeah, provided --

Q  Prior to receiving the money these were

Exhibit A

A   Correct.

Q   Thank you.  Did you ever provide copies, prior to the litigation, of any tax returns or related documents of SGR's to Woodland Drive or Mr. Charlton?

MR. DUNCAN:  Objection to the form.  It's a compound question.

Q   Okay.  Well, I'll start over.  Did you ever provide to Woodland Drive or Mr. Charlton copies of the SGR tax returns prior to this litigation?

MR. DUNCAN:  Same objection.

Q   Answer the question.

MR. DUNCAN:  You can answer the question but it's a compound question.  So there -- hard to know what the answer will be.  But you can answer it the best way you can.  He's asked you --

A   We did not implement this rejected proposal.

Q   Okay.  You didn't implement any of this. Okay.  Was Woodland Drive ever issued any units in SGR?

Exhibit A

Transcript of James Courtovich
January 27, 2023                                      34

correct?

    A   Correct.

    Q   Okay.  Okay.  Let's turn to Exhibit 8.

        (Thereupon, Exhibit 8 was marked for

identification.)

    A   Thank you.

    Q   Can you identify what this document is for

us?

    A   An email from Simon.

    Q   Right.  And this is -- what is -- tell us

what this email is?

    A   Just received the money and we appreciate

his confidence.

    Q   Okay.  Great.  So this is your

acknowledgment of receiving the 4 million dollars,

correct?

    A   Yeah.

    Q   Let's turn to tab 9, Exhibit 9.

        (Thereupon, Exhibit 9 was marked for

identification.)

    A   Thanks.

    Q   Can you identify what this document is for

Exhibit A

us, Exhibit 9, Mr. Courtovich?

A  It says security agreement.

Q  Right.  On page 5 of Exhibit 9, is that your signature?

A  I can't say that it is.

Q  Do you have any recollection of ever signing this document?

A  This is the security agreement.

Q  Yes.

A  I did sign two documents.  So this could be that -- one of those documents.

Q  What -- what makes you believe that that might not be your signature?

A  Just because it doesn't look like it.  But I did sign two documents and I think it could be the security agreement.

Q  Okay.  Let me turn you to -- well, let me let me go back.  So --

A  In about 5 minutes I'm going to need a bathroom break.  So I don't know if you --

MR. DUNCAN:  All right.  Let's take it now.

Exhibit A

THE WITNESS:  Okay.

MR. COOK:  That's fine.

(Thereupon, a recess was had.)

BY MR. COOK:

Q  Mr. Courtovich, in an earlier part of the deposition we reviewed a term sheet and then we reviewed, in Exhibit 6, an operating agreement, a member control agreement, and a security agreement --

MR. DUNCAN:  Draft.

MR. COOK:  Draft.

MR. DUNCAN:  Draft.

MR. COOK:  Draft, draft, draft.  That's fine.  Yeah, yeah, yeah.

BY MR. COOK:

Q  And your testimony was that these documents have been rejected so there's no reason to look at them, correct?

A  Correct.

Q  Right.  Okay.  I'm going to now hand you an exhibit that we are going to mark as Exhibit 10.

Exhibit A

(Thereupon, Exhibit 10 was marked for identification.)

MR. COOK:  I think Tara is madly labeling them as we speak.

MR. DUNCAN:  It's nice you do your own commentary.

MR. COOK:  Helps the record, right?

BY MR. COOK:

Q  Isn't it a fact, Mr. Courtovich, that Mr. Simon -- Mr. Simon Charlton signed these documents on behalf of Woodland Drive on the -- and that -- those signatures on these documents was transmitted to you the same day that you received the funds?

MR. DUNCAN:  I actually don't see him on this email.  Am I missing something?

MR. COOK:  Okay.  Sorry.  I stand corrected.  You're correct.  All right.

MR. DUNCAN:  No, I don't see him on this email at all.

MR. COOK:  Agreed, yeah.

BY MR. COOK:

Exhibit A

Q   Who is Andrew Sherman, do you know?

A   I can't see his email address so I don't know.

Q   How about Ms. Brunsdale?  No?

A   No.

Q   Isn't it a fact that Ms. Brunsdale is one of your lawyers at Jones Day?

A   Only lawyer I dealt with there is Ben Ginsberg.

Q   All right.  Well, I have other documents here which we will review which indicate that Ms. Brunsdale is one of your lawyers at Jones Day. So --

MR. DUNCAN:  I think your question was, did he know who it was and he said he didn't. That's not unusual.

MR. COOK:  True, right.

BY MR. COOK:

Q   But now you can see, right, pursuant to this transmittal that Simon did sign for Woodland Drive documents that were forwarded him by your counsel that --

Exhibit A

A  Yes.

Q  These are your signatures.  Okay.  Great.  Let's progress to Exhibit 12.

(Thereupon, Exhibit 12 was marked for identification.)

MR. DUNCAN:  Could I ask, could you mark one of them with the exhibit number?  Thank you.

Q  Can you identify for us what Exhibit 12 is?

A  Deed of trust.

Q  Okay.  For what property?

A  Oh, 2900 Woodland Drive.  No, is this 625?

Q  Just to ease your review --

A  Oh, it's 625 Mass Ave.

Q  Right.  Can you explain to me what you're doing here with this particular deed of trust?

A  Taking a mortgage out.

Q  You're taking a mortgage out on --

A  625 Mass Avenue.

Q  Okay.  Great.  Let me finish my sentence.  Just trying to get it all down.  It's going to be in a transcript when we finish.

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    47

A  Oh, I just didn't want them to have all my personal financial information.

Q  Who's they?

MR. DUNCAN:  Do you know who they is?

THE WITNESS:  No.

Q  Is there any particular information you -- you were concerned about, in terms of your personal information being conveyed?

A  No.  I don't want people to see my records.

Q  Let's move onto Exhibit 14.  Take your time to review that.

(Thereupon, Exhibit 14 was marked for identification.)

A  Okay.

Q  You see in the email Simon Charlton is stating in his email to you, I had signed the documents back in late February or early March, I think, but we don't have anything signed back. Talks about other things there as well.  Up above, your email back to Mr. Charlton you say, let me check with Graham on the paperwork.  I had assumed

Exhibit A

it had been electronically signed by Kim.  What are you talking about?

A  I have no idea.  I would have to go back to my lawyers at Jones Day because I have no recollection.  But I need to confirm as to why version two wasn't signed by us.

Q  So you acknowledge that version two was signed by Simon Charlton, correct?  Well, didn't I just --

A  Which one is version two?  I thought you were going to get version two.  I'm --

MR. DUNCAN:  I think --

Q  Exhibit 10 --

MR. DUNCAN:  I think, if I remember, the record shows that he was not on version 10.

MR. COOK:  That was my question.

MR. DUNCAN:  Yeah.  But how would he testify to something he didn't receive?

MR. COOK:  If you wouldn't mind showing him Exhibit 10.

MR. DUNCAN:  Here's Exhibit 10 again.  Actually it's falling apart.

Exhibit A

Transcript of James Courtovich
January 27, 2023                    50

Q  Right.  But is it true that version two is signed by Mr. Charlton, correct?

MR. DUNCAN:  He's already testified he doesn't know.

A  I don't know the signature.  And I would have to reference back to them as to why we didn't sign it.

Q  Okay.  All right.  Let's move -- let's refer back to Exhibit 14.  Back to your -- your comment at the top of the page, Exhibit 14.  You say, morning, let me check with Graham on the paperwork.  I assume it had been electronically signed by Kim.  Who's Kim?

A  My CFO.

Q  Okay.  And what authority does she have to sign for you?

A  She just has an electric stamp.

Q  That has your signature?

A  Yes.

Q  I see.  Okay.  So she could -- she could have signed these documents for you.  The -- strike that.  She could have signed the operating

Exhibit A

MR. COOK:  I'm just asking generally if --
if he --

A  I mean --

Q  Mr. Courtovich --

A  There -- there are a lot of documents
signed --

Q  Mr. Courtovich, let me finish.  I just
asked you, generally, whether you had ever
authorized Kim, your CFO, to sign any of the
Woodland documents for you?

A  I assume I would not have if Jones Day
said let's not sign these.

Q  So your testimony is you have no
recollection of authorizing her to sign for you;
is that correct?

A  Yeah.  It looks like I'm on the train
right now and we're just -- yeah.  Anyway.  So I
have no recollection.

Q  All right.  What are we at, 15?  Exhibit
15?

MR. DUNCAN:  Yes.

(Thereupon, Exhibit 15 was marked for

Exhibit A

identification.)

A   Thanks.

Q   Mr. Charlton -- I'm sorry.  Mr. Courtovich, please review Exhibit 15 and refresh your recollection as to what that is.

A   Email from Simon Charlton.

Q   Right.  Right.  Do you see reference there at the -- I think it's the 1, 2, 3, 4, 5, sixth paragraph down -- where Mr. Charlton says, my understanding at the outset was that 2 million was for the property, which is obviously what happened.  And then, the remaining 2 million would be for funding the business, either employing staff or acquiring a team.  Obviously, neither happened.  So I would appreciate an update as to what you think the way forward is.

Did you respond to that email or that inquiry?

A   Yes.  But I'm not sure if in writing or in person.

Q   All right.  How did you respond?

A   I was surprised because the agreement was

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    56

A  Very similar to Forstmann Little, it was in all the documents but always waived.

Q  All right.  Let's turn to Exhibit 16.

(Thereupon, Exhibit 16 was marked for identification.)

Can you take a moment to review Exhibit 16, Mr. Courtovich?  Can you explain to me what this document is, Exhibit 16?

A  Well, I was talking about the investment and I was beginning in negotiating with Simon on the investment.

Q  Exhibit -- Exhibit 16 -- bless you. Exhibit 16 says, we planned to pay 1 million of the investment this month.  Did you do that?

A  No, we didn't come to any agreement.

Q  I'm sorry.  Did you do that?

A  No.

Q  No.  Thank you.  Pay your attention to what we'll mark as Exhibit 17.  Take your time to review what has been marked as Exhibit 17.  All right?

(Thereupon, Exhibit 17 was marked for

Exhibit A

identification.)

A   Mm-hmm.

Q   So let me just refer to Mr. Charlton's email to you at the bottom of Exhibit 17.  He's stating, in addition to under the terms emailed you and agreements, interest is due from the inception at 8 percent on the funds invested in real estate and 12 percent annual per annum on the balance, right?  Generally, that's what it says.  Correct?

A   Correct.

Q   Okay.  Great.  Up above in your email back to him, to Mr. -- it's your email to Mr. Charlton.  You say, we are redoing the financials based on restructuring and the payment of 1 million dollars later this month.  Did you ever make that payment?

MR. DUNCAN:  It actually doesn't say, and, there.  It says, we are redoing the financials based on restructuring of the payment of 1 million later this month.

MR. COOK:  It says the, the payment, correct.

Exhibit A

MR. DUNCAN: Yeah.

MR. COOK: Agreed.

BY MR. COOK:

Q  All right.  Did you make a 1 -- this 1 million dollar payment?

A  No.  Because we never came to an agreement.

Q  Okay.  Next you state, we're going to start to begin monthly payments close to the initial terms outlined at the beginning.  Did you do that?  Did you make monthly payments --

A  No.

Q  -- to Woodland?  Why is that?

A  Business interruption.

Q  Okay.  Great.  The second paragraph, your -- your email.  You say, ask for the signature on the house, we would like to wait just a few more months.  What are you referring to there?

A  I have no recollection.

Q  So read the rest of the paragraph and if you could --

A  When did I sign -- oh, I'm sorry.

Exhibit A

Transcript of James Courtovich
January 27, 2023                              60

the bottom part of the email?

A  We're an LLC and that property is in a residential part of Capitol Hill.  And it's well written about how crazy the neighbors are up there.  And I was having a lot of fundraiser dinners.  And we were doing one for Senator Portman and some neighbor just walked in the house and started screaming that you can't run a business out of here and blah, blah, blah.

And we were just solidifying it to make sure that we weren't giving fodder to -- I wanted to see what was going to be publicly filed. Because we didn't want to run afoul with our neighbors and cease being able to use the house.

Q  So what do you mean something publicly filed?  What are you referring to there?

A  I don't know.  I don't know what would be publicly filed and that's what I wanted to look into.

Q  You were going to file something publicly?

A  No.  This document that talked about, can I sign that a little later, was the document I'm

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    61

referring to.  I wanted to say what was going to happen to it.

Q  So you were concerned about Woodland Drive placing a lien or mortgage against the property? Is that what you were concerned about?

A  I was concerned about Capitol Hill neighbors getting access to try to demonstrate they're running a business out of a house in a residential street.  Which turns into a big problem on Capitol Hill.

Q  Well, how does Woodland Drive having a recorded interest in 625 Mass impact what you're doing at the property?

A  That's what I needed to look into --

Q  Right.

A  -- at this moment.

Q  Okay.  So is that why you hadn't signed the security agreement up to this point?

A  I can't go back in time and remember that.

Q  Okay.  You don't know?

A  Is this the document that I signed?  When did I sign it?

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    62

MR. DUNCAN:  If you want to take a break --

Q  Answer the question.

MR. DUNCAN:  -- we can take a break but otherwise you have to answer his questions.

A  Okay.

Q  So I'm talking about this security agreement that --

A  I don't recollect as to the timeline it took --

Q  Okay.

A  -- for either Simon or I to sign it.

Q  Isn't true that Simon -- after the funds were transferred to you it took almost 14 months for you to sign the security agreement?

A  I don't recollect.

Q  Okay.  Do you recollect Simon repeatedly asking you -- telling you that as part of the deal Woodland Drive needed an interest -- a security interest in the property?

A  He had -- he would reappear every four or five months convinced of something.

Exhibit A

Q  So is it your answer that, yes, Simon was repeatedly asking you for you to --

A  I can't speak to the number but he did --

Q  Okay.

A  -- ask.

Q  And on Exhibit 17, isn't that one of those instances where he says Woodland has been incorporated but does not yet have a security interest in the property, correct?

A  Correct.  But I always saw it as their home so --

Q  Repeat that?

A  But the paperwork --

Q  Repeat that?

A  I said I always saw it as their home.  So the paperwork was something to do but --

Q  Okay.  What interest did Woodland Drive have in 625 Mass Ave?

A  On paper?  I don't really know at this point.  But in spirit, it's theirs.

Q  But you never gave them an interest in 625 Mass Ave, did you?

Exhibit A

A  Didn't I sign it?

MR. DUNCAN:  If you recall, answer the question.  If you don't, tell him you don't recall.

A  I don't recall.

Q  Okay.  If you looked at --

A  I don't recall which document I signed.

Q  Well, but isn't it true that Woodland Drive was looking for a secured interest in 625 Mass Ave as part of the deal?  And didn't you promise to collateralize 625 in your first -- in Exhibit 2 --

MR. COOK:  I'm sorry, Russell.  Go ahead.

MR. DUNCAN:  Objection.  Those are two questions.  You should only ask him one question at a time.

MR. COOK:  Okay.

BY MR. COOK:

Q  Let's go back to Exhibit 2.  Looking at, in your first paragraph, they budgeted a maximum of 1.75 million for the property that, as discussed, will be held as collateral.  So you

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    65

were proposing at the very onset of the agreement that Woodland Drive would have an interest in 625 Mass, correct?

A   And I believe they do.

Q   If I went to public records today, would -- would I see any reference to Woodland Drive --

MR. DUNCAN:  Objection.

Q   -- in terms of ownership of 625 Mass?

MR. DUNCAN:  Objection.  That calls for speculation.  How will he know what you saw?

Q   Okay.  Did you ever authorize Woodland Drive to obtain a secured interest in 625 Mass Ave?

A   I don't have a recollection.

Q   Okay.  What are you --

MR. COOK:  Tara, we're at 18?

MS. HOPKIN:  Yes.

MR. COOK:  All right.

THE WITNESS:  Thank you.

BY MR. COOK:

Q   Can you review what's been marked as Exhibit 18?  Are you familiar with that document?

Exhibit A

(Thereupon, Exhibit 18 was marked for identification.)

A  I'm not familiar with it but I'm reading it.

Q  At the top of Exhibit 18, is that your email --

A  Yes.

Q  -- to Mr. Charlton?

A  Correct.

Q  All right.  And you see in Mr. Charlton's email to you, which follows up your email which is Exhibit 17 where you raise concern about interest in the property.  And Mr. Charlton writes to you ask for security, I am not sure I understand the concern, a lender having a charge on the property is not indicative of a business.  But if you are concerned and you think Woodland is an option, we should explore that.  How would we move that forward?

That's what it says, correct?

A  Correct.

Q  Right?  So obviously Woodland Drive is --

Exhibit A

and Simon -- is concerned about getting a security
interest in 625 Mass, correct?

A  I can't speak to what Simon was thinking.

Q  Well, isn't that what he says there?

A  He does say that here.

Q  Yes.  Okay.  And let's look at your email.
You said, I will talk to Kim about pulling all
that together.  Pull what together?  Take your
time to review Simon's email and the emails that
proceeded that.  What are you saying when you're
saying, I will talk to Kim about pulling all that
together?

A  I can't recollect.  Because don't forget,
we're having a lot of personal conversations as
well as written.

Q  I'm just trying to figure out what you're
talking about right here.

MR. DUNCAN:  He's testified he cannot
recollect.

Q  Further you state, I've had her rework the
budget and it reflects a 1 million dollar repay
and immediate pay down on property.  Did that ever

Exhibit A

occur?

A  No.

Q  You never made that payment.  All right.
Let's turn to Exhibit 19.

(Thereupon, Exhibit 19 was marked for
identification.)

MR. COOK:  Tara, if you could pass that
out?

A  Thank you.

Q  Can you explain to me what this email
pertains to?

A  We got a big sticker on the door.  A cease
and desist.

Q  A cease and desist what?

A  Using the house.

Q  I'm sorry?

A  Using the house.

Q  At all?

A  At all.

Q  And how was that resolved?

A  I hired Benny Cass who is a real estate
lawyer and --

Exhibit A

Q   Okay.  At the end of your statement -- or, your email, you say, or can we wait a few more months and we get through this grinds of a cease order.  What's your concern there?

A   That there's an orange sticker on the house that we can't go into.

Q   What does that have to do with giving Woodland Drive an interest in the property?

A   Same as I answered before.

Q   Which is?

A   I didn't know what public filing would be available so I wanted to look into that.

Q   What do you mean available?

A   Just as you had said, what would you go see if you went downtown to the public records department.  The same thing.

Q   Just a second.  Okay.  So this is going to be Exhibit 20, I think.  Right?

(Thereupon, Exhibit 20 was marked for identification.)

MS. HOPKIN:  20.

MR. COOK:  What's that?

Exhibit A

Transcript of James Courtovich
January 27, 2023                                    73

Q  Yeah.  And what are you referring to there in this email?

A  I -- I wish I brought my calendar.  I guess I could be better off to remember what I was thanking him for.  But I think -- I think this could be, they owed a good chunk of money and Simon paid it.

Q  What company are you referring to in this email?

A  Sphere, SGR.  Must be Sphere because the Gosaibis were a client of Sphere.

Q  So this email pertains to your --

A  To the best of my knowledge and my guess would be that would be it.

Q  So to the best of your knowledge this is a reference to payments from AHAB to Sphere Consulting?

A  To the best of my knowledge.

Q  So to the best of your knowledge, this has nothing to do with 4 million dollars you received relating to the Woodland Drive deal?

A  I don't know.

Exhibit A

Transcript of James Courtovich
January 27, 2023                                76

MR. DUNCAN:  Objection.  That calls for a legal conclusion.  Whether it had an security interest or not is a matter of law.

Q  Did you agree -- or did you ever allow Woodland drive to place a mortgage against 625 -- or any sort of property interest against 625 Massachusetts Avenue?

A  So I never got involved with the legal aspects of it.  The lawyers did that.  I always, and still do, see it as their property.  And so whether a document is signed or not, you know, I'm not taking a tow truck and moving it down the street.

Q  If it's their property why did you take out a mortgage against it and not tell them?  Why did you not tell them --

A  I told them eventually.

Q  I'm sorry?

A  They found out from me.

Q  What -- what's that?

A  I told them eventually.

Q  Eventually.  But at the time -- at the

Exhibit A

time you took out the mortgage you didn't tell Woodland, correct?  Correct?

A  I don't know when I told them.  I don't recollect.

Q  You don't recollect.  Yeah.  All right. Did there ever come a time Simon Charlton asked you whether there were any liens against the 625 Massachusetts Avenue property?

A  In this email.

Q  At least what?  At least there, correct?

A  Mm-hmm.

Q  Did you tell him then?

A  I don't recollect when I told him.

Q  23.  Let's look at Exhibit 23.

(Thereupon, Exhibit 23 was marked for identification.)

On the first page of Exhibit 23 do you say -- do you see where Simon Charlton says to you, Jim, were you okay with the amount I referred to below being 6 -- 2.65 million and we roll up the interest for the first year, okay?  I do need to resolve this as I'm very exposed on our side.  So

Exhibit A

Transcript of James Courtovich
January 27, 2023                                        78

I would appreciate your help in getting this done this week.

Do you see that?

A   Mm-hmm.

Q   Right.  And you respond -- in your response, 2.65, question mark.  I saw -- I saw -- I last saw 2 which I planned to pay down by half within weeks.  So this is your statement to Simon Charlton that you're going to pay, what, a million dollars within weeks just -- to Woodland Drive; is that correct?

A   Yes.

Q   Okay.  And then you further say, the original security was for house at 1.65 but things -- with things the way they are so 2 is fine.  Did you ever -- did you ever make that payment --

A   No.

Q   -- you referenced in this email?  You did not make that payment?

A   Correct.

Q   Correct.  Okay.  So this is, like, the third or fourth time you've promised to make this

Exhibit A

Transcript of James Courtovich
January 27, 2023                                      79

million dollar payment and you never did, correct?

A  Correct.

Q  And in your email you use the first person.  You say, I plan to pay down by half this week, correct?  That's what you say in your email, correct?

A  Yes.

Q  All right.  Let's -- let's continue.  Exhibit 24.  Take your -- take some time to review that, if you would, please.

(Thereupon, Exhibit 24 was marked for identification.)

A  Mm-hmm.

Q  So in this email, Mr. Courtovich, you say -- in responding to Mr. Charlton's concern about exposure -- let's just say your exposure today is far less today than it was last week.  We will get caught up on interest, et cetera, and settle all books this week.  Can you tell me what you're -- what are you saying here?

A  Well, this refers to we had a client Andora that offered us a significant amount of the

Exhibit A

money that was frozen because the bank they owned was deemed, under the Patriot Act, 311.  And so they had a hard time moving money.

Q  Okay.  But you say, we will get caught up on interest, et cetera, and settle all books this week.  So this means you're promising to pay interest.  Is that why later in your email you say, quote, unquote, knowing I will pay down 1 million very shortly?

A  That was my hope to do that.

Q  I see.  That was your hope to pay down interest, et cetera, and settle all books?

A  Correct.

Q  Okay.  I think you answered this but you never made at 1 million dollar payment?

A  No.

Q  Right.  Okay.  Exhibit 25.

MR. COOK:  Tara, are we up to 25?

MS. HOPKIN:  25.

Mr. COOK:  Okay.  Let's -- I guess.

BY MR. COOK:

Q  All right.  Handed you what's been marked

Exhibit A

way ahead of our proposed schedule.  What are you referring to there?

A  That with the payment from the Ciercos we would be able to get ahead of schedule.

Q  What schedule is that?

A  The repayment of the loan part of the investment which would be the half.

Q  Okay.  So you recognize you had an obligation to repay those monies?

A  Correct.  And when you refer to those monies, we're referring to the 2 million dollars loan aspect, not the 2 million dollar investment?

Q  Mm-hmm.

A  Okay.

Q  Well, no.  That's -- that's not correct, right?  When you characterize -- let's -- let's --

MR. DUNCAN:  Well, that's what he's testified to.  You may not agree with it but that's what he believes.

MR. COOK:  I refer you back to Exhibit 6, page 4, 4.2.

MR. DUNCAN:  I'm sorry, where are you

Exhibit A

Sphere; is that correct?

A   Yes.

Q   Right.  And you are one hundred percent, quote, unquote, owner of each of those?

A   Yes.

Q   Yes.  No other entity has any --

A   No.

Q   -- units in SGR or Sphere?

A   No.

Q   Right.  And no units were ever given by SGR to Woodland Drive, correct?

A   When you say units, I don't even know what that means.

Q   Right.

A   You mean, like, stock?

Q   Yeah.  Membership?

A   Okay.

Q   Yeah.  Yeah.

A   Yeah.

Q   The operating agreements that were --

A   Correct.

Q   -- passed around talked about --

Exhibit A

A   Percentage of the board.

Q   -- membership interest.  Yeah.  Thank you. Thank you.  Yeah.  You didn't give any membership interest in SGR to Woodland Drive, correct?

A   No.

Q   That's what I thought.

A   Not yet.  We got into a little bit of a spat so things were on hold.

MR. COOK:  Okay.  Why don't we -- Tara, go ahead and address the Jones Day documents.  Yeah. Just to --

MS. HOPKIN:  Exhibit 31.

MR. COOK:  Okay.  I don't have anything yet so it's all you.

MS. HOPKIN:  This will be 31.

MR. COOK:  Okay.  Thank you.

THE WITNESS:  Thank you.

(Thereupon, Exhibit 31 was marked for identification.)

BY MR. COOK:

Q   Mr. Courtovich, this is a pretty simple request of you.  This has been presented to you --

Exhibit A

CERTIFICATE OF COURT REPORTER


    I, Clinton Carmichael, the officer before whom the foregoing proceedings was taken, do hereby certify that said proceedings were electronically recorded by me; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 9th day of February, 2023.


_____

   Clinton Carmichael, Digital Court Reporter

Exhibit A

CERTIFICATE OF TRANSCRIBER

I, Janice Willier, do hereby certify that the foregoing transcript is a true and correct record of the recorded proceedings; that said proceedings were transcribed to the best of my ability from the audio and supporting information; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

*Janice Willier*
_____

Janice Willier

February 9, 2023

Exhibit A