## Hopkins, Tara D.

| | |
|---|---|
| **From:** | Shaleen J Brunsdale <sbrunsdale@jonesday.com> |
| **Sent:** | Tuesday, March 3, 2015 5:26 PM |
| **To:** | Brett Walter |
| **Cc:** | Andrew J Sherman; Laura D Sheldon |
| **Subject:** | Re: Friday Call |
| **Attachments:** | WAI_783212283_2_Subscription Agreement and Questionnaire.DOCX; WAI_783212135_2_Operating Agreement of S.G.R. LLC.DOCX; WAI_783212245_2_S.G.R. LLC Member Control Agreement.DOCX; WAI_783212655_2_Sphere_Security Agreement.DOCX |

Brett:

Thank you so much for your edits. I am attaching a revised set of all the documents.

With regard to your question about drag along rights: essentially the agreement provides that if 75% of the Members decide they want to sell the company (and the potential buyer is requiring that all Members must sell), then the 75% group can force the remaining members to also sell, such that the sale takes place. However, there are exceptions to this rule: (i) the terms of the sale cannot ask that any member be liable for the reps and warranties of other members, (ii) the 25% members are only liable for their percentage of units, (iii) they should receive the same consideration for their units as is being received by the 75% group and (iv) any options given to the 75% group (such as stock options versus cash) should also be given to the 25% group. Basically, these exceptions to the drag-along rights ensure that the minority members (who are being "forced" to sell) are protected and they are typical exceptions that minority members should expect to receive.

Let me know if you want to walk through this via phone. I will be in my office if you want to call me in the morning tomorrow (if so, let me know what time you will be calling).

Kind regards,
Shaleen


Shaleen Brunsdale (bio)
Associate
**JONES DAY® - One Firm Worldwide℠**
51 Louisiana Ave., N.W.
Washington, D.C. 20001-2113
Office +1.202.879.3690
Cell +1.515.771.3069
sbrunsdale@jonesday.com


From:    Brett Walter <bwalter@ahalgosaibi.com>
To:      Andrew J Sherman <ajsherman@JonesDay.com>,
Cc:      Shaleen J Brunsdale <sbrunsdale@jonesday.com>
Date:    03/03/2015 12:02 AM
Subject:     Re: Friday Call



**Confidential**          **Exhibit A.13**

Morning Andrew and Shaleen

As discussed yesterday, very little from me on the documents.  See attached.

Also on the Subscription Agreement I think the membership units should be 4,900 not 5,100.

Let me know when you have a few minutes today and we can catch up.  Thanks

Brett

**Brett Walter**
General Counsel
**A.H. Al Gosaibi & Bros**
Office:  +966 13 882 2666 (ext. 318)
Mobile: + 966 50 380 1001
bwalter@ahalgosaibi.com


This e-mail may contain information that is confidential or privileged. If you are not the intended recipient, do not read, copy or distribute the e-mail or any attachments. Instead, please notify the sender and delete the e-mail and any attachments.  In any event please consider the environment before printing.
Thank you.

**From:** Andrew J Sherman <ajsherman@JonesDay.com>
**Date:** Monday, March 2, 2015 at 6:19 PM
**To:** Brett Walter <bwalter@ahalgosaibi.com>
**Cc:** Shaleen J Brunsdale <sbrunsdale@jonesday.com>
**Subject:** Re: Friday Call

I have a 10:30 and then nonstop meetings...does this window still work?

If not, please arrange an alternative time with Shaleen.
----------------------------------------------
Andrew J. Sherman
Partner--M+A and Corporate
Jones Day
51 Louisiana Ave. NW
Washington, DC 20001-2113 Direct: 202.879.3686
Fax: 202.626.1700  ajsherman@jonesday.com
-----------------------------------------------
-------------------
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
--------------------


**From:** Andrew J Sherman
**Sent:** 03/02/2015 09:43 AM EST
**To:** "Brett Walter" <bwalter@ahalgosaibi.com>
**Subject:** Re: Friday Call

Yes....at 10:15am EST
---------------------------------------------
Andrew J. Sherman
Partner--M+A and Corporate
Jones Day

2

Confidential                    Exhibit A.13

51 Louisiana Ave. NW
Washington, DC 20001-2113 Direct: 202.879.3686
Fax: 202.626.1700  ajsherman@jonesday.com

-----------------------------------------------

-------------------

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

--------------------

**From:** Brett Walter [bwalter@ahalgosaibi.com]
**Sent:** 03/02/2015 02:35 PM GMT
**To:** Andrew Sherman
**Subject:** Re: Friday Call

Andrew, are you available this morning for a quick chat? Thanks

Brett

Brett Walter
General Counsel
Ahmad Hamad Algosaibi & Bros.
Bwalter@ahalgosaibi.com
+966 50 380 1001

On 26 Feb 2015, at 17:57, Andrew J Sherman <ajsherman@JonesDay.com> wrote:

I'll be at the office line.

202-879-3686.

Thanks

---------------------------------------------

Andrew J. Sherman
Partner--M+A and Corporate
Jones Day
51 Louisiana Ave. NW
Washington, DC 20001-2113 Direct: 202.879.3686
Fax: 202.626.1700  ajsherman@jonesday.com

-----------------------------------------------

-------------------

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

--------------------

**From:** Graham Miller [graham@sphereconsulting.com]
**Sent:** 02/26/2015 01:49 PM GMT
**To:** Andrew Sherman; Brett Walter <bwalter@ahalgosaibi.com>
**Subject:** Friday Call

Confidential          Exhibit A.13

Andrew,
I just spoke to Brett (copied here) and he is available tomorrow at 10am EST / 6pm AST.  Can you provide the best number for him to reach you at?
Many thanks,
Graham

Graham Miller
Sphere Consulting
202.862.5522 (o)
571.438.2276 (m)[attachment "20150302 SGR-Member Control Agreement (investor comments).docx" deleted by Shaleen J Brunsdale/JonesDay] [attachment "20150302 SGR-Operating Agreement (investor comments).docx" deleted by Shaleen J Brunsdale/JonesDay] [attachment "20150302 SGR-Security Agreement (investor comments).docx" deleted by Shaleen J Brunsdale/JonesDay]


==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

Confidential                    Exhibit A.13

**S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING**

**SUBSCRIPTION AGREEMENT**

***PLEASE READ CAREFULLY BEFORE SIGNING***

ALL SUBSCRIPTIONS ARE SUBJECT TO ACCEPTANCE IN WHOLE OR IN PART BY S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING FOR ANY OR NO REASON IN ITS SOLE DISCRETION. ALL INFORMATION REQUIRED TO BE PROVIDED HEREIN BY SUBSCRIBERS FOR DETERMINING PURCHASER QUALIFICATION WILL BE KEPT STRICTLY CONFIDENTIAL.

To:          S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING

Ladies and Gentlemen:

1.       **Subscription.**  The undersigned hereby desires to subscribe for 4,900 limited liability company membership units (the "Unit" or "Units" as the context may apply), of S.G.R. LLC, Government Relations and Lobbying, a Delaware limited liability company (the "LLC"), for a total of Four Million Dollars ($4,000,000). The Units in the LLC will be subsequently reduced as per the LLC's operating agreement. Payment in full for the Units of the undersigned accompanies this Subscription Agreement by check payable to "S.G.R. LLC, Government Relations and Lobbying " or such amount shall be made available by wire transfer of immediately available funds.

2.       **Acceptance of Subscription Agreement.**  The undersigned agrees that, upon the acceptance of this Subscription Agreement by the LLC, the undersigned shall become a holder of the Units. It is understood, however, that this subscription is not binding on the LLC until the LLC accepts this Subscription Agreement, which acceptance is in the LLC's sole discretion.

3.       **Representations and Warranties.**  To induce the LLC to accept this Subscription Agreement, the undersigned hereby represents, warrants and covenants to the LLC as follows:

A.       The undersigned acknowledges that the undersigned has been furnished with background materials, which set forth the relevant terms and conditions of this investment, including provisions related to the ownership of real estate by James Courtovich, and such other documents and information as the undersigned (and the undersigned's Purchaser Representative, if any) deems necessary or appropriate for evaluating an investment in the LLC. The undersigned confirms that the undersigned (and the undersigned's Purchaser Representative, if any) has carefully read and understands these materials and has made such further investigation of the LLC as was deemed appropriate by the undersigned (and the undersigned's Purchaser Representative, if any) to obtain additional information to verify the accuracy of such materials and to evaluate the merits and risks of this investment. The undersigned acknowledges that the undersigned (and the undersigned's Purchaser Representative, if any) has had the opportunity to ask questions of, and receive answers from, the LLC concerning the terms and conditions of the offering and the information contained in the offering materials, and all such questions have been answered to the undersigned's full satisfaction.

B.       The undersigned understands that the Units have not been registered under the Securities Act of 1933, as amended ("Securities Act"), or the securities or similar laws of any state, and are offered in reliance on exemptions therefrom.

C.       The undersigned is an accredited investor as defined in Section 501(a) of Regulation D under the Securities Act.

D.       The undersigned understands that neither the Securities and Exchange Commission nor any other federal or state agency has recommended, approved or endorsed the purchase of the Units as an

Confidential

Exhibit A.13

investment or passed on the accuracy or adequacy of the information set forth in the offering materials or any other LLC documents provided to the undersigned.

E.    The undersigned is in a financial position to afford to hold the Units for an infinite amount of time, the undersigned's financial condition being such that the undersigned is not presently under (and does not contemplate any future) necessity or constraint to dispose of the Units to satisfy any existing or contemplated debt or undertaking.

F.    The undersigned recognizes that the LLC is a highly speculative venture involving a high degree of financial risk and the undersigned can bear the economic risk of losing the undersigned's entire investment in the Units. The undersigned's overall commitment to investments which are not readily marketable is not disproportionate to the undersigned's net worth and investment in the Units will not cause the undersigned's overall commitment to become excessive. The undersigned is familiar with the nature of, and risks attendant to, investments in securities of the type being subscribed for and has determined, in consultation with the undersigned's Purchaser Representative, if any, that the purchase of such securities is consistent with the undersigned's investment objectives.

G.    The undersigned, either alone or together with the undersigned's Purchaser Representative, if any, has the requisite knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of this investment and to be capable of protecting the undersigned's interests in connection with this transaction.

H.    The undersigned confirms that the undersigned is acquiring the Units subscribed for herein solely for the undersigned's own account, for investment, and not with a view to the distribution or resale of such Units.

I.    The undersigned understands that there are substantial restrictions on the transferability of the Units; the Units have not been registered under the Securities Act or the securities laws of any state and such registration is not contemplated in the future; there is no public market for the Units; upon acceptance of this Subscription Agreement by the LLC the undersigned shall have the obligation to hold the Units for at least one (1) year; and it may not be possible for the undersigned to liquidate the undersigned's investment in the LLC and accordingly, the undersigned may have to hold the Units, and bear the economic risk of this investment, indefinitely.

J.    If the undersigned is an individual, the undersigned has the legal capacity and authority to execute, deliver, and perform the undersigned's obligations under this Subscription Agreement. If the undersigned is a corporation, partnership, trust or other entity, the person executing this Subscription Agreement has the full power and authority to execute and deliver this Subscription Agreement on behalf of the subscribing entity, and such entity is duly formed and organized, validly existing and in good standing under the laws of its jurisdiction of formation, and such entity is authorized by its governing documents to execute, deliver and perform its obligations under this Subscription Agreement and to become a holder of the Units. Furthermore, such investment is in accordance with all laws applicable to the undersigned's operations. If the undersigned is a partnership and any of the individual partners have the right to make a decision whether or not the partnership is to participate in the purchase of the LLC's Units, each of such partners shall complete and execute a separate copy of this Subscription Agreement.

K.    If the undersigned is an entity, it has not been organized for the specific purpose of acquiring the Units or if it has been organized for the specific purpose of acquiring the Units, each of its beneficial owners is separately an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act, and each of such beneficial owners shall complete and execute a separate copy of this Subscription Agreement.

L.    If the undersigned is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), in making the proposed investment the undersigned is aware of and has taken into consideration the applicable fiduciary standards of conduct under ERISA, including, but not limited to, the prudence and diversification requirements of Section 404(a)(1) of ERISA.

S-2

WAI-783212283v2
Confidential    Exhibit A.13

M.      The undersigned represents, warrants and certifies that the undersigned is not subject to "back-up withholding" pursuant to Section 3406 of the Internal Revenue Code of 1986, as amended, and that the undersigned has provided the undersigned's correct tax identification number below.

N.      The undersigned confirms that the Units were not offered to the undersigned by any means of general solicitation or general advertising, and that the undersigned has received no representations, warranties or written communications with respect to the offering of the Units other than those contained in the background materials, and in entering into this transaction the undersigned is not relying upon any information other than that contained in the offering materials and the results of the undersigned's own independent investigation.

O.      The undersigned acknowledges that the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning the LLC and to consult with the undersigned's tax advisor regarding the tax consequences of being a stockholder of the LLC.

P.      The undersigned understands that the Units, if issued in certificates, shall bear, substantially, the following legend until (i) such securities shall have been registered under the Securities Act and effectively been disposed of in accordance with a registration statement that has been declared effective or (ii) in the opinion of counsel satisfactory to the LLC such securities may be sold without registration under the Securities Act as well as any applicable state securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS AND SUCH SECURITIES, WILL BE, ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR FOR RESALE IN CONNECTION WITH, ANY DISTRIBUTION THEREOF. ALSO, THE SECURITIES REPRESENTED HEREBY MAY NOT BE OFFERED, SOLD, PLEDGED, HYPOTHECATED, ASSIGNED OR TRANSFERRED EXCEPT: (i) PURSUANT TO A REGISTRATION STATEMENT UNDER THE ACT WHICH HAS BECOME EFFECTIVE AND IS CURRENT WITH RESPECT TO THESE SECURITIES OR (ii) PURSUANT TO A SPECIFIC EXEMPTION FROM REGISTRATION UNDER THE ACT BUT ONLY UPON A HOLDER HEREOF FIRST HAVING OBTAINED THE WRITTEN OPINION OF COUNSEL TO THE COMPANY, OR OTHER COUNSEL REASONABLY ACCEPTABLE TO THE COMPANY, THAT THE PROPOSED DISPOSITION IS CONSISTENT WITH ALL APPLICABLE PROVISIONS OF THE ACT AS WELL AS ANY APPLICABLE STATE SECURITIES LAW.

4.      **Reliance on Representations and Warranties; Notification Requirements.** The undersigned understands the meaning of the representations and warranties contained in this Subscription Agreement and in the Questionnaire to Prospective Offerees (the "Suitability Questionnaire") and understands and acknowledges that the LLC is relying upon the representations and warranties contained in this Subscription Agreement and in the Suitability Questionnaire in determining whether the offering is eligible for exemption from the registration requirements contained in the Securities Act and the securities laws of any state, and in determining whether to accept the subscription tendered hereby. The undersigned represents and warrants that the information contained in this Subscription Agreement and in the Suitability Questionnaire is true and correct as of the date hereof and agrees to immediately notify the LLC of any changes in such information prior to the date the LLC accepts this Subscription Agreement. In addition, the undersigned agrees to immediately notify the LLC of any changes to the contact information for the undersigned. The undersigned hereby agrees to indemnify and hold harmless the LLC and its members, managers, officers, directors, agents and employees from and against any and all losses, damages, expenses, liabilities or reasonable attorneys' fees (including reasonable attorneys' fees and expenses incurred in a securities or other action in which no judgment in favor of the undersigned is rendered) due to or arising out of a breach of any representation or warranty of the undersigned, whether contained in this Subscription Agreement or the Suitability Questionnaire. Notwithstanding any of the representations, warranties, acknowledgments or agreements made in this Subscription Agreement and in the Suitability Questionnaire by the undersigned, the undersigned does not thereby or in any other manner waive any rights granted to the undersigned under federal or state securities law.

S-3


Confidential


Exhibit A.13

S-4

5.      **Survival of Representations and Warranties.** In the event that this subscription is accepted, the undersigned agrees that the representations, warranties and agreements set forth in this Subscription Agreement and in the Suitability Questionnaire shall survive the acceptance of this subscription.

6.      **Assignability.** The undersigned agrees not to transfer or assign this Subscription Agreement, or any interest of the undersigned therein.  This Subscription Agreement and the representations and warranties contained herein shall be binding upon the heirs, executors, administrators and other successors of the undersigned, and this Subscription Agreement shall inure to the benefit of and be enforceable by the LLC.  If there is more than one signatory hereto, the obligations, representations, warranties and agreements of the undersigned are made jointly and severally.

7.      **Applicable Law.** This Subscription Agreement shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflicts of law.  In the event of any litigation arising out of this Subscription Agreement or the transactions contemplated herein, the parties agree that any action or suit shall be brought in a court of record in the State of Delaware, and the parties will consent to the venue and submit themselves to the *in personam* jurisdiction of such courts for the purposes of resolving any disputes arising out of this agreement or the transactions contemplated herein.

8.      **Entire Agreement.** This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, may be amended only by a writing executed by all of the parties, and supersedes any prior agreement between the parties with respect to the subject matter hereof.

\* \* \* \* \*

S-4

WAI-783212283v2

Confidential                    Exhibit A.13

## SIGNATURE PAGE FOR INDIVIDUALS AND JOINT ACCOUNTS

The undersigned hereby subscribe(s) for 4,900 Units for a total price of $4,000,000.

| | | | |
|---|---|---|---|
| Signature | Print Name | Social Security No. | Date |

| | | | |
|---|---|---|---|
| Signature | Print Name | Social Security No. | Date |

Residential Address: _____

_____

_____

Mailing Address (if different): _____

_____

_____

( ___ ) _____
Home Telephone

( ___ ) _____
Office Telephone

_____
E-Mail Address

Type of Ownership (Initial)  _____  Individual
 _____  Tenants in Common (Both Parties Sign)
 _____  Joint Tenants with Right of Survivorship (Both Parties Sign)
 _____  Community Property (Both Parties Sign)

S-5

Confidential  Exhibit A.13

S-6

**SIGNATURE PAGE FOR ENTITIES**

The undersigned hereby subscribe(s) for 4,900 Units for a total price of $4,000,000.

Form of Organization:        _____Partnership        _____Corporation        _____Trust

      If the undersigned is a corporation, please include the Articles of Incorporation, Bylaws and Corporate Resolution certified by the Secretary of the Corporation authorizing the execution of this Subscription Agreement. If the undersigned is a partnership, please include a certified copy of the Statement of Partnership or Partnership Agreement authorizing the execution of this Subscription Agreement. If the undersigned is a trust, please include a copy of the Trust Agreement and any other documentation authorizing the execution of this Subscription Agreement.

Full Name of the Subscriber: _____

Tax I.D. Number: _____

Address: _____

Phone: (     ) _____

Facsimile: (     ) _____

E-Mail Address: _____

      The undersigned warrants that he/she has full power and authority to execute this Subscription Agreement on behalf of the above entity and that an investment in the LLC is not prohibited by the governing documents of the entity or by any law applicable to such entity.

Entity Name: _____

By: _____
                          (Signature)

_____
              (Signer's Printed Name)

Date: _____

S-6

WAI-783212283v2

Confidential

Exhibit A.13

## ACCEPTANCE

The undersigned officer of S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING hereby accepts the foregoing subscription this _____ day of _____, 2015. This subscription shall not be binding until accepted by the LLC and shall become effective as of the date of such acceptance, upon the terms set forth in Section 2 of the Subscription Agreement.

**S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING**

By: _____

Name: _____

Title: _____

S-7

Confidential

Exhibit A.13

**S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING**

**QUESTIONNAIRE TO PROSPECTIVE OFFEREES**

**(To be completed by each offeree concurrent
with delivery of a Subscription Agreement)**

The undersigned understands that the limited liability company membership units (the "Units") of S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING, a Delaware limited liability company (the "LLC"), will not be registered under the Securities Act of 1933, as amended (the "Securities Act"), or the laws of any state. The undersigned also understands that in order to ensure that the offering and sale of the Units is exempt from registration under the Securities Act and state law, the LLC is required to have reasonable grounds to believe, and must actually believe, after making reasonable inquiry that all purchasers, or their respective Purchaser Representative, if used, are able to evaluate the merits and risks of the investment, and where a Purchaser Representative has been retained, that all such purchasers are able to bear the economic risk of the investment.

The undersigned understands that the information supplied in this letter will be disclosed to no one, without the undersigned's consent, other than (i) the LLC and its officers, employees, accountants and counsel, or (ii) if it is necessary for the LLC to use such information to support the exemption under the Securities Act and state law.

BECAUSE THE LLC WILL RELY ON THE UNDERSIGNED'S ANSWERS IN ORDER TO COMPLY WITH FEDERAL AND STATE SECURITIES LAWS, IT IS IMPORTANT THAT THE UNDERSIGNED CAREFULLY ANSWER EACH APPLICABLE QUESTION. ANY PURCHASER MAY BE HELD LIABLE FOR ANY MISSTATEMENT OR OMISSION IN THIS QUESTIONNAIRE.

In order to induce the LLC to permit the undersigned to purchase the Units, the undersigned hereby represents as follows:

1.  To ensure that the Units are sold pursuant to an appropriate exemption from registration under applicable federal and state securities laws, the undersigned is furnishing certain information by checking all boxes below preceding any statement below which is applicable to the undersigned. By checking one of the boxes below, the undersigned represents that the undersigned is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act.

    The undersigned certifies that the information contained in each of the following checked statements (to be checked by only if applicable) is true and correct and hereby agrees to immediately notify the LLC of any changes which should occur in such information prior to the LLC's acceptance of any subscription. In the event that the undersigned is not an "accredited investor," the undersigned must be certain to complete Section 2 below.

    A.  ☐   The undersigned is a natural person whose individual net worth or joint net worth (excluding the value of his, her or their primary residence but including any net debt in such primary residence if the debt of the primary residence is higher than its market value) with that person's spouse as of the date hereof is in excess of $1,000,000.

    B.  ☐   The undersigned is a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has reasonable expectation of reaching the same income level in the current year.

    C.  ☐   The undersigned is a corporation, partnership or trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring Units, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) of Regulation D under the Securities Act.

Q-1

WAI-783212283v2
Confidential      Exhibit A.13

D. ☐ The undersigned is an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if the investment decision has been made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are accredited investors.

E. ☐ The undersigned is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

F. ☐ The undersigned is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring Units, with total assets in excess of $5,000,000.

G. ☐ The undersigned is a bank as defined in Section 3(a)(2) of the Securities Act, or a savings and loan association or other institution as defined in Section (3)(a)(5)(A) of the Securities Act, whether acting in its individual capacity for its own account or fiduciary capacity for the account of a qualified eligible participant (as defined below).

H. ☐ The undersigned is a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

I. ☐ The undersigned is an insurance company as defined in Section 2(13) of the Securities Act acting for its own account or for the account of a qualified eligible participant.

J. ☐ The undersigned is an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Act"), or a business development company as defined in Section 2(a)(48) of the Investment Act and was not formed for the specific purpose of investing in the Units.

K. ☐ The undersigned is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, as amended.

L. ☐ The undersigned is a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000.

M. ☐ The undersigned is an entity in which each of the equity owners are accredited investors as defined in Rule 501(a) of Regulation D under the Securities Act.

N. ☐ The undersigned is a manager or executive officer of the LLC.

2. Each prospective investor is required to retain the services of a Purchaser Representative when such prospective investor does not have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of acquiring the Units. The following is an indication of the undersigned's knowledge and experience or, alternatively, the necessity of the services of a Purchaser Representative. The undersigned certifies that the information contained in the following checked statements is true and correct and hereby agrees to

Q-2

Exhibit A.13

notify the LLC of any changes which should occur in such information prior to the LLC's acceptance of this subscription.

A.    ☐    The undersigned has such knowledge and experience in financial matters that the undersigned is capable of evaluating the merits and risks of an investment in the Units and will not require the services of a Purchaser Representative. The undersigned offers as evidence of knowledge and experience in these matters the information contained in this Suitability Questionnaire.

B.    ☐    The undersigned has retained a financial or investment adviser, broker, attorney or accountant ("Purchaser Representative") to assist the undersigned in evaluating the potential risks and merits of this investment and to advise the undersigned with respect to this offering. The undersigned and the Purchaser Representative together have such knowledge and experience in financial matters that the undersigned and the Purchaser Representative are capable of evaluating the merits and risks of an investment in the Units. The name, address and occupation of such Purchaser Representative is:

_____

_____

_____

Such Purchaser Representative must complete the Purchaser Representative Acknowledgment that is attached hereto.

Note:    Each investor that checks Box B must also check Box C below and obtain a Purchaser Representative Acknowledgment in the form attached hereto.

C.    ☐    The undersigned has received from the undersigned's Purchaser Representative a written statement disclosing any material relationship between the Purchaser Representative or his or her, as applicable, affiliates and the LLC or its affiliates which exists, may exist, or has existed at any time during the previous two years and any compensation received or to be received as a result of such relationship.

Note:    Each Purchaser Representative must complete the Purchaser Representative Acknowledgment in the form attached hereto.

3.    Check the statement below if applicable:

☐    The undersigned represents, warrants and certifies that the undersigned is a U.S. citizen or a U.S. resident for purposes of U.S. income taxation and that the undersigned will notify the LLC within sixty (60) days of a change to foreign status.

4.    Check the statement below if applicable:

☐    The undersigned is an employee benefit plan within the meaning of ERISA (including both 401(k) and other types of defined contribution plans) that permits participant directed investments.

5.    The undersigned has attached IRS Form W-9 (for individual United States citizens or residents, or entities treated as United States persons), or IRS Form W-8BEN (for foreign investors), as applicable.

Q-3

WAI-783212283v2
Confidential

Exhibit A.13

6.    **TO BE COMPLETED BY ALL INDIVIDUAL INVESTORS.** In order to induce the LLC to permit the undersigned to purchase the Units, the undersigned hereby represents as follows (please attach additional sheets if necessary to respond):

A.    My full name, primary residence address and telephone number are:

Name: _____

Address: _____

Telephone: (     ) _____

E-Mail Address:_____

My marital status is: _____    My age is: _____

My social security number is: _____-_____-_____

B.    My firm name, business address and telephone number are:

Firm Name: _____

Address:    _____

_____

Telephone: (     ) _____

E-Mail Address:_____

Nature of business: _____

C.    My Occupation/Title is: _____

Length of time in position: _____

D.    Other business affiliations (*e.g.*, service on boards of directors, etc.):

_____

E.    Give occupation(s) and other business associations during the last 5 years. Listing the most recent position first, provide the names of employers, if any, the kinds of business of such employers, positions with such employers and the years employed thereby (please attach additional sheets if necessary).

Name of Employer:    _____

Kind of Business:    _____

Position Held:    _____

Years Employed (approx.): _____ From _____ To _____

F.    Education:

Confidential

Q-4

Exhibit A.13

(a)     The highest level of education attained: _____

(b)     The last degree earned, date and institution: _____

G.     For the purpose of complying with certain state securities laws, the following information is required.

In which state(s) do you file income tax returns? _____

In which state do you hold a valid driver's license? _____

In which state are you registered to vote? _____

H.     Do you intend to purchase Units solely for your own account?
_____ Yes     _____ No

If not, please indicate who else would have a direct or indirect interest in the Units purchased and the nature of that interest?

_____

I.     Previous Investment Experience:

(a)     Do you have a brokerage account? _____ Yes     _____ No

(b)     Have you ever before bought securities which were exempt from federal and state registration (private placement offerings)? ___ Yes ___ No

(c)     Have you ever invested in an issuer whose form of business was a limited partnership or limited liability company?
_____ No _____ Once _____ Twice or More

J.     I am able to bear the economic risk of an investment in the Units, including, without limiting the generality of the foregoing, the risk of losing part or all of my investment in the Units and the probable inability to sell or transfer the Units for an indefinite period of time.

K.     I represent and warrant that the information contained in this Suitability Questionnaire is complete, true and correct, and that I will notify the LLC immediately of any material change in any statement made herein occurring prior to my receipt of the LLC's acceptance of my subscription.

Dated: _____, 20__

_____
Investor's Signature

_____
Print or Type Name of Investor

Q-5

WAI-783212283v2
Confidential

Exhibit A.13

7.    **TO BE COMPLETED BY ENTITIES.** In order to induce the LLC to permit the undersigned to purchase the Units, the undersigned hereby represents as follows (please attach additional sheets if necessary to respond):

A.    Name of the investor:_____

_____

B.    (a)    Address of the investor (principal place of business):_____

_____

_____

(b)    Is the investor's principal place of business located, or does the investor have substantial amounts of assets, in any other state(s)? _____ Yes _____ No. If "Yes", which state(s)?

_____

_____

(c)    Telephone and facsimile number (if any) of the investor:

Telephone: (    )_____

Facsimile: (    )_____

E-Mail Address:_____

C.    The investor is (check appropriate type and give the requested information):

_____    Corporation (state and approximate date of incorporation):_____

_____

_____    Partnership (state and approximate date on which original certificate was filed or date of partnership agreement if filing not required):_____

_____

_____    Trust (State and date of Trust Agreement):_____

_____    Limited Liability Company (state and approximate date on which original certificate was filed):_____

_____    Other (Describe):_____

_____

Exhibit A.13

Confidential

D.      Taxpayer Identification Number of the Investor:_____

E.      Is the investor an employee benefit, pension, stock bonus or profit-sharing plan, "simplified employee pension plan," so-called "Keogh" plan for self-employed individuals, individual retirement account, welfare benefit plan (such as a medical plan, death benefit plan or prepaid legal services plan), governmental plan, church plan, or any entity whose underlying assets are considered to be plan assets by reason of any investment in the entity, or otherwise a "benefit plan investor" within the meaning of 29 C.F.R. Section 2510.3-101(f)(2) (the Department of Labor plan asset regulations)?

_____ Yes     _____ No

F.      If the entity is a partnership, state the name and state of residence of each general partner; if the entity is a limited liability company, state the name and state of residence of each manager (or if no manager, each member); if the entity is a trust, state the name and state of residence of each trustee and the principal beneficiaries, if the entity is an estate, state the name and state of residence of each executor or administrator and the principal beneficiaries; and if the entity is a corporation, state the name and state of residence of each director, executive officer and over 10% stockholder, and provide the number of stockholders in such corporation (please attach additional sheets if necessary):

_____

_____

_____

G.    (a)    State the nature of the investor's business during the last 10 years and the investor's present and proposed business:_____

_____

    (b)    Was the investor organized for the specific purpose of acquiring the Units?

_____ Yes _____ No. If "Yes," please explain._____

_____

    (c)    After this investment, will more than eighty percent (80%) of the value of the assets of the investor consist of Units? _____ Yes _____ No.

    (d)    Were the securities of or interests in the investor sold by way of a registered public offering or an unregistered private placement?

_____

    (e)    If either (b) or (c) is checked "Yes," each owner of any equity interest in the entity shall complete and sign a separate copy of this Subscription Agreement and Suitability Questionnaire.

H.    (a)    Provide the number of beneficial owners in the investor:_____

    (b)    Provide a breakdown of the number of each of the following types of beneficial owners in the investor, and if a beneficial owner is a corporation, partnership, trust, or other entity, provide the number of shareholders, partners, beneficiaries, or other equity or beneficial owners of each such beneficial owner.

WAI-783212283v2
Confidential

Exhibit A.13

| Type of Beneficial Owner | Number of Such Beneficial Owner | If an entity Beneficial Owner, Number of Its Beneficial Owners |
|---|---|---|
| Individuals | | |
| Corporations | | |
| Partnerships | | |
| Trust | | |
| Other entities | | |

Describe:_____

I. If the investor is a partnership or limited liability company, is the investment in Units being participated in by the partners or members, as the case may be, of the investor in substantially the same proportions as prior investments made by the investor?

_____ Yes    _____ No    _____ Not applicable.  If "No," please explain.

_____

If "No," will more than eighty percent (80%) of the value of the assets held on behalf of any partner or member of the investor consist of Units? _____ Yes _____ No

If "Yes" (i.e. more than eighty percent (80%) of any partner's or member's interest is attributable to Units, each such partner or member of the investor shall complete and sign a separate copy of this Subscription Agreement and Suitability Questionnaire.

J. Is the investor engaged, or has the investor ever held itself out or does the investor presently hold itself out or anticipate holding itself out to the beneficial owners or the public as being engaged, or does the investor anticipate engaging, in the business of investing, reinvesting, owning, holding, or trading in securities?

_____ Yes    _____ No.  If "Yes," give details.

_____

K. The investor represents and warrants that the information contained in this Suitability Questionnaire is complete, true and correct, and that it will notify the LLC immediately of any material change in any statement made herein either occurring prior to its receipt of the LLC's acceptance of its subscription or thereafter.

Dated: _____, 20__    _____
               Print or Type Name of Investor

          By:_____
             Signature of Authorized Signatory

            _____
             Print or Type Title of Signatory

Q-8

Confidential

Exhibit A.13

## S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING
## PURCHASER REPRESENTATIVE ACKNOWLEDGMENT

The undersigned hereby acknowledges that he or she, as applicable, is the Purchaser Representative (as that term is defined in Rule 501 promulgated under the Securities Act of 1933) of _____. By reason of the undersigned's knowledge and experience in business and financial matters in general, and securities investments in particular, the undersigned, on behalf of the above named subscriber, believes himself or herself, as applicable, capable of evaluating and has in fact evaluated the merits and risks of this investment on behalf of the above named subscriber. The undersigned further acknowledges that he or she, as applicable, has received a copy of the background materials (as defined in the S.G.R. LLC, Government Relations and Lobbying Subscription Agreement dated _____), and any other information that the undersigned deemed appropriate to evaluate this investment. Furthermore, the undersigned acknowledges that he or she, as applicable, has had the opportunity to ask questions of and receive satisfactory answers or documentation from S.G.R. LLC, Government Relations and Lobbying, concerning the terms and conditions of the offering and the information contained in the background materials.

Except as otherwise previously disclosed by the undersigned to the subscriber in writing, the undersigned is not an officer, employee or affiliate of S.G.R. LLC, Government Relations and Lobbying, or the owner of ten percent (10%) or more of the equity interest in of S.G.R. LLC, Government Relations and Lobbying, and neither the undersigned nor any affiliate of the undersigned currently has or has had during the past two years, or contemplates having in the future, any material relationship with S.G.R. LLC, Government Relations and Lobbying  or its affiliates.

**PURCHASER REPRESENTATIVE:**

Signature: _____

First Name: _____

Last Name: _____

Occupation: _____

_____
Date

_____
Address

_____
City                State            Zip Code

_____
(Area Code)  Telephone

_____
E-Mail Address

_____
Name

Q-9

WAI-783212283v2

Confidential                Exhibit A.13

**OPERATING AGREEMENT**
**OF**
**S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING**

THIS OPERATING AGREEMENT OF S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING (this "Agreement") is made and entered into as of this ___ day of _____, 2015, between Sphere Consulting LLC ("Sphere"), Woodland Drive LLC (the "Investor"), and other Persons that become Members from time to time (collectively, the "Members"), and S.G.R. LLC, Government Relations and Lobbying, a Delaware limited liability company (the "Company").

**W I T N E S S E T H:**

WHEREAS, the Company was formed effective as of the 26th day of March, 2014 by the issuance of the Certificate of Formation by the Secretary of State of the State of Delaware; and

WHEREAS, the Members of the Company desires to set forth herein their agreement with respect to the Company.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned hereby agree as follows:

ARTICLE I

DEFINITIONS

The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

"Act" means the Delaware Limited Liability Company Act (Title 6 §§ 18-101 et seq.) as amended from time to time (or any corresponding provision of succeeding law).

"Agreement" has the meaning set forth in the preamble.

"Board" is the board of directors of the Company, which shall comprise of three (3) directors, one (1) who shall be designated by the Investor and two (2) who shall be designated by Sphere.

"Board Vote" has the meaning set forth in Section 5.2 hereof.

"Capital Contribution" means the total amount of cash and the fair market value of any property (less the amount of indebtedness, if any, to which the contributed property is subject, as of the date of the contribution) that the Members have contributed to the capital of the Company.

"Certificate" means the Certificate of Formation of the Company, as filed with the Secretary of State of the State of Delaware, as the same may be amended from time to time.

Confidential                    Exhibit A.13

"Chief Executive Officer" means James Courtovich.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Company" has the meaning set forth in the preamble.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association or any foreign trust or foreign business organization.

"Indemnified Person" has the meaning set forth in Section 8.1.1 hereof.

"Investor" has the meaning set forth in the preamble.

"Members" has the meaning set forth in the preamble.

"Member Action" has the meaning set forth in Section 6.4 hereof.

"Member Majority Vote" has the meaning set forth in Section 6.1 hereof.

"Member Supermajority Vote" has the meaning set forth in Section 6.2 hereof.

"Notices" has the meaning set forth in Section 10.10 hereof.

"Party" means a Person who was, is, or is threatened to be made a named defendant or respondent in a Proceeding.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

"Percentage Ownership" means the percentage of limited liability company membership interests owned by the Members of the Company.

"Proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative and whether formal or informal.

"Sphere" has the meaning set forth in the preamble.

"Units" means the limited liability company membership units.

2

WAI-783212135v2

Confidential                    Exhibit A.13

## ARTICLE II

## FORMATION OF COMPANY

2.1     Formation. The Company was formed by the execution and delivery of Certificate to the Secretary of State of the State of Delaware in accordance with the provisions of the Act.

2.2     Name. The name of the Company is "S.G.R. LLC, Government Relations and Lobbying."

2.3     Principal Place of Business. The Company may locate its places of business and registered office at any other place or places as the Members may from time to time deem advisable.

2.4     Registered Office and Registered Agent. The Company's initial registered office shall be at the office of its registered agent at 1209 Orange Street, Wilmington, Delaware 19801 and the name of its initial registered agent at such address is The Corporation Trust Company. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of the State of Delaware pursuant to the Act and the applicable rules promulgated thereunder.

2.5     Fictitious Business Name Statement; Other Certificates.     The Chief Executive Officer will, from time to time, register the Company as a foreign limited liability company and file on behalf of the Company such fictitious or trade name statements or certificates in such jurisdictions and offices as the Chief Executive Officer considers necessary or appropriate. The Company may do business under any fictitious business names deemed desirable by the Board. The Company will, from time to time, file such certificates of amendment, certificates of cancellation, or other certificates as the Board reasonably deems necessary under the Act or under the laws of any jurisdiction in which the Company is doing business to establish and continue the Company as a limited liability company or to protect the limited liability of the Members.

2.6     Term. The term of the Company commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually unless the Company is dissolved and its affairs wound up in accordance with the Act or this Agreement.

## ARTICLE III

## PURPOSE AND BUSINESS OF COMPANY

3.1     Purpose and Business of the Company. The business and purpose of the Company shall be to:

3.1.1   Exercise all powers that may be exercised legally by limited liability companies under the Act and engage in any lawful business, purpose or activity in which a limited liability company may be engaged under the Act.

3.1.2   Engage in all activities necessary, customary, convenient, or incident to such

3

WAI-783212135v2
Confidential                    Exhibit A.13

business and purpose in which a limited liability company may be engaged under the Act.

## ARTICLE IV

## MEMBER INFORMATION AND LOAN

4.1    Name and Percentage Ownership. The names of the Members and their corresponding Percentage Ownership and Units shall be as set forth in Schedule A.

4.2    Loan. The Investor shall invest Four Million Dollars ($4,000,000) ("Loan") into the Company, which shall constitute its Capital Contribution, in a lump sum, due and payable by March 5, 2015. After the provision of the Loan, the Percentage Ownership and Units shall be as set forth in Schedule B. The Company shall use the proceeds of the Loan to:

4.2.1    establish operations in Washington, D.C., with possible expansion to locations including London, Dubai, the European Union, and Saudi Arabia;

4.2.2    for general working and growth capital; and

4.2.3    to purchase real estate in Washington, D.C. for up to Two Million Dollars ($2,000,000), which shall be obtained in James Courtovich's name, and not the Company's name. Sphere shall grant to Investor a security interest in the real estate pursuant to a Security Agreement. The security interest shall secure the payment of the real estate portion of the Loan.

4.3    Return of Loan.

4.3.1    The outstanding balance of the Loan shall be returned to the Investor using forty nine percent (49%) of the annual net income of the Company, and the timeline of repayment is dependent upon such annual net income. As the Loan is repaid, the percentage of ownership will be redistributed amongst the Members pursuant to the below:

| Outstanding Loan Balance | Sphere Percentage Ownership | Investor Percentage Ownership |
| --- | --- | --- |
| $4,000,000 | 51% | 49% |
| $3,000,000 | 55% | 45% |
| $2,000,000 | 60% | 40% |
| $1,000,000 | 70% | 30% |

4.3.2    Upon full repayment of the Loan, the Percentage Ownership and Units of the Members shall be as set forth in Schedule C.

4.4    Interest. Any allocation of the Loan to real estate will be repaid at an eight percent (8%) annual interest rate. The remaining Loan, which will be allocated to the Company's operations, will be repaid at a twelve percent (12%) annual interest rate.

4.5    Joinder. Each new Member shall become a signatory hereto by signing a joinder to

4

WAI-783212135v2

Confidential                         Exhibit A.13

this Agreement, and such other instruments, in such manner, as the Company shall determine; provided, however, that a Person can only become a Member of the Company after signing a joinder to this Agreement. By so signing, each new Member, as the case may be, shall be deemed to have adopted and to have agreed to be bound by all of the provisions of this Agreement. The joinder in relation to a new Member shall not be considered an amendment to this Agreement notwithstanding anything else to the contrary in this Agreement. Pursuant to Schedule C, Simon Charlton shall become a new Member after the Loan has been repaid.

## ARTICLE V

## MANAGEMENT

5.1    Management by the Board. Except for Member Actions as required in Article VI, the business and affairs of the Company shall be managed by the Board. The Board shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purpose described herein, including all powers, statutory or otherwise, possessed by the managing member under the laws of the State of Delaware.

5.2    Voting. The affirmative vote of a majority of the directors on the Board ("Board Vote") shall decide any question brought before the Board, unless the question is one upon which, by express provision of the Act or this Agreement, a different vote is required, in which case such express provision shall govern and control the decision of such question.

5.3    Officers. The Company shall have a Chief Executive Officer, as described below. The Board may elect such other officers of the Company as the Board believe to be in the best interests of the Company. The officers of the Company shall have such authority and shall perform such duties as are customarily incident to their respective offices or as may be specified from time to time by resolution of the Board or Board Vote, regardless of whether such authority and duties are customarily incident to such office.

5.4    Chief Executive Officer. The Chief Executive Officer shall serve as the chief administrative officer of the Company and, subject to the control of the Board, shall be authorized to perform all duties customary to that office, including maintaining responsibility for the day-to-day affairs of the Company and doing any and all things necessary, proper, convenient or advisable to effectuate the purposes of the Company.

5.5    Compensation; Reimbursements. Except as otherwise provided herein, the Chief Executive Officer shall receive such fees or other compensation for his services hereunder as may be determined from time to time by the Board. Notwithstanding the foregoing, the Members and any affiliates thereof may request reimbursement, and shall be reimbursed by the Company, for all actual out-of-pocket expenses incurred in furtherance of the Company's business (including, without limitation, any salary or other compensation paid to Persons retained or employed by the Company and expenses incurred in connection with the Company's compliance with the reporting requirements under Article VII hereof).

## ARTICLE VI

5

WAI-7832|2135v2
Confidential          Exhibit A.13

RIGHTS, OBLIGATIONS AND ACTIONS OF THE MEMBERS

6.1    Member Majority Vote.  Without the prior written consent of the Members holding more than fifty percent (50%) of the Percentage Ownership ("Member Majority Vote"), the Board has no authority to:

6.1.1    directly or indirectly, cause the Company to consolidate or merge with or into another Person, sell, assign, pledge, transfer, lease, mortgage, convey or otherwise dispose of any material asset not in the ordinary course of business or all or substantially all of the assets or Company Assets of the Company, or engage in any other transaction with substantially the same effect; provided, however, that the company may license any of its assets;

6.1.2    substantially and fundamentally change the nature of the Company's business as conducted on the date hereof or as proposed to be conducted on the date hereof;

6.1.4    amend the Articles in any way;

6.1.5    make any investment in any entity; or

6.1.6    dissolve the company.

6.2    Member Supermajority Vote.  Without the prior written consent of the Members holding more than seventy-five percent (75%) of the Percentage Ownership ("Member Supermajority Vote"), the Board has no authority to:

6.2.1    approve the Company's annual budget;

6.2.1    incur any Company indebtedness in excess of $250,000;

6.2.3    incur any lien upon any of the Company's property or revenues in excess of $250,000.

6.3    Management Team.  Without the prior written consent of Sphere and the Investor, the Board has no authority to:

6.3.1    enter the Company into employment agreements with Persons, which agreements are valued at over One Hundred Thousand Dollars ($100,000) per year.

6.4    Actions/Consents By the Members.  In any instance where any approval, election, consent, designation, vote, action or determination of the Members is expressly required or provided for in this Agreement (a "Member Action"), such Member Action may be taken by one or more written consents describing the Member Action taken, signed by the Members and included in the Company records.  Such Member Action will be effective when the Members signs the consent(s), unless the consent(s) specify(ies) a different effective date.  The execution and delivery of any document or consent by any Person with apparent authority to act for or on behalf of the Members shall be conclusive evidence of the authorization to the Company, and any third party shall be

6

WAI-783212135v2

Confidential            Exhibit A.13

authorized to rely conclusively thereon.

## ARTICLE VII

## TAX MATTERS AND RECORDS

7.1    Tax Matters

7.1.1    The Company will timely file all Company tax returns and will timely file all other writings required by any governmental authority having jurisdiction to require such filing. Within 90 days after the end of each tax year (or as soon as reasonably practicable thereafter), the Company will send to each Member copies of Schedule K-1 or any successor schedule or form with respect to such Member, together with such additional information as may be necessary for such Member to file its federal and state income tax returns.

7.1.2    The Board will make all decisions with respect to the treatment of Company transactions in the Company's federal, state, local and foreign tax returns. Except as otherwise provided herein, all tax elections required or permitted to be made under the Code and any applicable state, local or foreign tax law, including any election under Section 754 of the Code, will be made in the discretion of the "tax matters partner."

7.1.3    Notwithstanding the foregoing at those times that the Company has more than one Member, the parties intend that the Company will be treated as a partnership for federal income tax purposes and the Members treated as partners for federal income tax purposes and neither the Company nor any of the Members will make any election (for tax purposes or otherwise) inconsistent with such tax treatment.

7.1.4    Beginning on the Effective Date, the Chief Executive Officer will be the "tax matters partner" of the Company as that term is defined in Section 6231(a)(7) of the Code with all powers and duties afforded a tax matters partner under the Code.

7.2    Books and Records. The Company shall keep true, accurate and complete books of account in which shall be entered fully and accurately each and every transaction of the Company. All books of account, together with a copy of this Agreement and the Certificate, shall be kept at the principal office of the Company and any Member or its designated agents shall have the right to inspect and copy such books at all reasonable times upon not less than ten (10) business days prior written notice.

7.3    Business Plan. Sphere shall develop an annual business planning process and shall present the completed business plans to the Investor.

7.4    Reports. The Company shall provide other business reports and updates on a periodic basis, including: (i) monthly unaudited financial statements provided by the Company's internal controller and  (ii) quarterly compiled financial statements and annual audited financial statements provided by Company's external CPA.

7

WAI-783212135v2
Confidential                    Exhibit A.13

7.5    Accounting Method. For both financial and tax reporting purposes, the books and records of the Company will be kept on the accrual method of accounting applied in a consistent manner (unless a different method is required by the Code) and will reflect all Company transactions and be appropriate and adequate for the Company's business.

ARTICLE VIII

INDEMNIFICATION AND EXCULPATION

8.1    Indemnification.

8.1.1    General. The Company, to the fullest extent permitted by the Act and any other applicable law, (a) shall indemnify and hold harmless the Members, directors, and officers of the Company, and (b) may, at the sole discretion of the Board, indemnify and hold harmless any current or former Member, manager, director, officer, employee or agent of the Company (each Person to be indemnified pursuant to (a) or (b), an "Indemnified Person") from and against any losses, claims, damages, liabilities or expenses (including, without limitation, attorneys' fees) whatsoever to which such Indemnified Person may become subject in connection with any matter arising out of or in connection with the Company.

8.1.2    Advance for Expenses. The Company shall, before final disposition of a Proceeding, advance funds to pay for or reimburse the reasonable expenses (including attorneys' fees) incurred by an Indemnified Person who is a Party to a Proceeding if such Person delivers to the Company a written affirmation of his, her or its good faith belief that his, her or its conduct does not constitute behavior that would prohibit the Company from indemnifying the Indemnified Person pursuant to the Act, and such Indemnified Person furnishes the Company a written undertaking, executed personally or on his, her or its behalf, to repay any advances if it is ultimately determined that he, she or it is not entitled to indemnification under this Article VIII or the Act.

8.1.3    Non-Exclusivity of Indemnification and Advancement of Expenses. The indemnification and advancement of expenses provided by, or granted pursuant to, this Article VIII shall not be deemed exclusive of, but shall be in addition to, any other rights to which those seeking indemnification or advancement of expenses may be entitled, and the Company may make other or further indemnification or advancement of expenses of any Indemnified Person under any agreement or otherwise, both as to action by such Indemnified Person in his, her or its official capacity and as to action in another capacity while holding such office or position.

8.1.4    Limits on Indemnification. Notwithstanding anything in this Article VIII to the contrary, each of the Members and the Company intends that the Company shall indemnify an Indemnified Person to the fullest extent permitted by the Act.

8.2    Exculpation. An Indemnified Person shall not be liable to the Company for any losses, claims, damages or liabilities arising from any act or omission performed or omitted by such on behalf of the Company except for any losses, claims, damages or liabilities for which indemnification of the Indemnified Person is not permitted pursuant to Section 8.1.4 hereof.

8.3    Survival and Limits on Amendment. The indemnification and advancement of

8

Confidential                    Exhibit A.13

expenses provided by, or granted pursuant to, this Article VIII shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a Member, manager, director, officer, employee or agent of the Company and shall inure to the benefit of the heirs, executors, and administrators of such a person. The Members and the Company agree that the indemnification and advancement of expenses rights granted in this Agreement to each Indemnified Person are coupled with an interest in favor of each such Indemnified Person.

8.4    Severability. In the event that any of the provisions of this Article VIII (including any provision within a single section, paragraph or sentence) is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions are severable and shall remain enforceable to the fullest extent permitted by law.

ARTICLE IX

DISSOLUTION AND TERMINATION

9.1    Dissolution. The Company shall be dissolved upon the occurrence of any of the following events:

9.1.1  by a Member Majority Vote coupled with a Board Vote;

9.1.2  by the death, incompetence, expulsion, or bankruptcy of all Members, or the occurrence of any event that terminates the continued membership of all the Members in the Company; or

9.1.3  the entry of a decree of judicial dissolution of the Company;

9.2    Sale of Company Assets. Upon dissolution, the Board shall sell such of the Company assets as it deems necessary or appropriate. A full accounting shall be made of the accounts of the Company and of the Company's assets, liabilities and income, from the date of the last accounting to the date of such dissolution. In accounting for distributions of the Company's property, such property shall be valued at the fair market value at the date of dissolution as determined by the Board.

9.3    Distribution of Assets. Within the time period required by applicable regulations, the Board shall apply the Company assets, in the following order of priority:

9.3.1  First, to the payment and discharge of, or reservation for, all of the Company's debts and liabilities to Persons and the expenses of dissolution and winding up in the order or priority as provided by law;

9.3.2  Second, to the payment to a reserve fund for contingent liabilities to the extent deemed reasonable by the Board;

9.3.3  Third, to the repayment of loans or advances that may have been made by any Member to the Company; and

9

WAI-7832|213.5v2
Confidential                    Exhibit A.13

9.3.4    Fourth, to the Members in accordance with their Percentage Ownership, provided, however, that no payment or distribution in any of the foregoing categories will be made until all payments in each prior category shall have been made in full.

9.4    Return of Capital Contributions.  Upon dissolution, the Members shall look solely to the assets of the Company for the return of any Capital Contributions, and shall be entitled only to (i) a cash distribution or (ii) a distribution in kind of the Company's assets.

9.5    Certificate of Dissolution.  On completion of the distribution of Company assets as provided herein, the Chief Executive Officer (or such other person or persons as the Act may require or permit) will file a Certificate of Dissolution with the State of Delaware, cancel any other filings made pursuant to Section 2.5, and take such other actions as may be necessary to terminate the existence of the Company.

ARTICLE X

MISCELLANEOUS PROVISIONS

10.1    Application of Delaware Law.    This Agreement, and the application and interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Delaware (without regard to choice of law rules), and specifically the Act.

10.2    Execution of Additional Instruments.  The Members hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

10.3    Construction.  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

10.4    Headings.  The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

10.5    Waivers.  The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

10.6    Rights and Remedies Cumulative.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or constitute a waiver of the right to use any or all other remedies.  Such rights and remedies are given in addition to any other rights the parties may have by law or otherwise.

10.7    Heirs, Successors and Assigns.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors

10

Confidential                    Exhibit A.13

and assigns.

10.8    Creditors.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company.

10.9    Counterparts.  This Agreement may be executed and delivered by facsimile or electronically, in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10   Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt.  All communications shall be sent to the respective parties at the addresses, email addresses, or facsimile numbers provided from time to time.

10.11   Amendments.  Any amendment to this Agreement shall be made in writing and signed by the Members and the Company.

10.12   Severability.  In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

10.13   Determination of Matters Not Provided For In This Agreement.  The Board shall decide any questions arising with respect to the Company and this Agreement which are not specifically or expressly provided for in this Agreement.

10.14   Further Assurances.  The Members agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

10.15   Entire Agreement.  This Agreement contains the entire agreement among the parties relating to the subject matter hereof, all prior negotiations among the parties with respect thereto are merged into this Agreement and there are no other promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between them with respect to the transaction contemplated herein.

**[Signatures on Following Page]**

11

WAI-7832213135v2
Confidential                    Exhibit A.13

IN WITNESS WHEREOF, the Members and the Company have executed this Agreement effective as of the date first set forth above.

**COMPANY**

S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING

By: _____

Name: _____

Title: _____

**MEMBERS**

SPHERE CONSULTING LLC

By: _____

Name: _____

Title: _____

WOODLAND DRIVE LLC

By: _____

Name: _____

Title: _____

12

WAI-783212135v2

Confidential                    Exhibit A.13

## SCHEDULE A

## CURRENT OWNERSHIP

| Name of Member | Percentage Ownership | Units |
|---|---|---|
| Sphere Consulting LLC | 100% | 10,000 |

13

WAI-783212135v2

Confidential

Exhibit A.13

## SCHEDULE B

### POST-FINANCING PERCENTAGE OWNERSHIP

| Name of Member | Percentage Ownership | Units |
|---|---|---|
| Sphere Consulting LLC | 51% | 5,100 |
| Woodland Drive LLC | 49% | 4,900 |

14

Confidential                    Exhibit A.13

## SCHEDULE C

### POST-LOAN REPAYMENT PERCENTAGE OWNERSHIP

| Name of Member | Percentage Ownership | Units |
|---|---|---|
| Sphere Consulting LLC | 70% | 7,000 |
| Woodland Drive LLC | 20% | 2,000 |
| Simon Charlton | 10% | 1,000 |

15

Confidential                    Exhibit A.13

Confidential                    Exhibit A.13

## MEMBER CONTROL AGREEMENT

This MEMBER CONTROL AGREEMENT (this "**Agreement**") is made and entered into as of this ___ day of _____, 2015, between Sphere Consulting LLC ("**Sphere**"), Woodland Drive LLC (the "**Investor**"), and other Persons that become Members from time to time (collectively, the "**Members**"), and S.G.R. LLC, Government Relations and Lobbying, a Delaware limited liability company (the "**Company**").

## RECITALS

**WHEREAS**, the Members have incorporated the Company for the purposes of establishing a business or multiple businesses;

**WHEREAS**, the Members have entered into that certain Operating Agreement of S.G.R. LLC, Government Relations and Lobbying, dated _____ ___, 2015 (the "**Operating Agreement**"), and the Units of the Company are owned in the percentages stated in the Schedules to the Operating Agreement, as such may be adjusted or amended from time to time; and

**WHEREAS**, the Members and the Company hereby agree that this Agreement shall govern the rights of the Members related to the Units and shall govern certain other matters as set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual promises made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1.　　　Definitions.　For purposes of this Agreement:

　　　1.1　　"**Board**" means the Company's board of directors.

　　　1.2　　"**Certificate**" means the Certificate of Formation of the Company, as filed with the Secretary of State of the State of Delaware, as the same may be amended from time to time.

　　　1.3　　"**Company Notice**" means written notice from the Company notifying the selling Member that the Company intends to exercise its Right of First Refusal as to some or all of the Units with respect to any Proposed Transfer.

　　　1.4　　"**Derivative Securities**" means any securities or rights convertible into, or exercisable or exchangeable for (in each case, directly or indirectly) Units, including options and warrants.

　　　1.5　　"**Fair Market Value**" means the fair market value as determined by an independent appraiser selected by the Board.

　　　1.6　　"**Fully Exercising Member**" has the meaning set forth in Section 3.1(b).

Confidential　　　　Exhibit A.13

1.7   **"Immediate Family Member"** means a child, stepchild, grandchild, parent, stepparent, grandparent, spouse, domestic partner, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, of a natural person referred to herein.

1.8   **"Incentive Units Plan"** means an incentive Units plan to be adopted in the future by the Board for the benefit of the Company's employees.

1.9   **"Member Notice"** means written notice from a Member notifying the Company and the selling Member that such Member intends to exercise its Secondary Refusal Right as to a portion of the Units with respect to any Proposed Transfer.

1.10   **"New Securities"** means, collectively, equity securities of the Company issued after the date hereof, whether or not currently authorized, as well as rights, options, or warrants to purchase such equity securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for such equity securities; provided, however, that Derivative Securities and Units granted or sold to employees, directors and bona fide consultants and Derivative Securities and Units granted under any incentive plan (including the Incentive Units Plan) of the Company are not New Securities.

1.11   **"Offer Notice"** has the meaning set forth in Section 3.1(a).

1.12   **"Participating Member"** means any Member exercising its Secondary Refusal Right or Tag Along Right, as applicable.

1.13   **"Person"** means any individual, company, partnership, trust, limited liability company, association or other entity.

1.14   **"Proposed Transfer"** means any assignment, sale, offer to sell, pledge, mortgage, hypothecation, encumbrance, disposition of or any other like transfer or encumbering of any Units (or any interest therein) proposed by any of the Members.

1.15   **"Proposed Transfer Notice"** means written notice from a Member setting forth the terms and conditions of a Proposed Transfer.

1.16   **"Prospective Transferee"** means any person to whom a Member proposes to make a Proposed Transfer.

1.17   **"Proposed Sale"** has the meaning set forth in Section 4.2.

1.18   **"Right of First Refusal"** means the right, but not an obligation, of the Company, or its permitted transferees or assigns, to purchase some or all of the Units with respect to a Proposed Transfer, on the terms and conditions specified in the Proposed Transfer Notice.

1.19   **"Sale of the Company"** has the meaning set forth in Section 4.1.

2

Confidential   Exhibit A.13

1.20   "**Secondary Notice**" means written notice from the Company notifying the Members that the Company does not intend to exercise its Right of First Refusal as to the Units with respect to any Proposed Transfer.

1.21   "**Secondary Notice Period**" has the meaning set forth in Section 2.1(c).

1.22   "**Secondary Refusal Right**" means the right, but not an obligation, of each non-transferring Member to purchase up to its pro rata portion (based upon the total number of Units then held by all non-transferring Members) of any Units not purchased pursuant to the Right of First Refusal, on the terms and conditions specified in the Proposed Transfer Notice.

1.23   "**Selling Members**" has the meaning set forth in Section 4.1.

1.24   "**Tag Along Right**" means the right, but not an obligation, of a Member to participate in a Proposed Transfer on the terms and conditions specified in the Proposed Transfer Notice, if such a Proposed Transfer would result in more than fifty percent (50%) of the Units being sold to a Prospective Transferee.

1.25   "**Tag Along Notice**" has the meaning set forth in Section 2.2(a).

1.26   "**Units**" means limited liability company membership interests owned by the Members, or issued to a Member after the date hereof.

2.      Agreement Among the Company and the Members.

2.1     Right of First Refusal.

(a)     Grant.  Subject to the terms of Section 2.4 below, each Member hereby unconditionally and irrevocably grants to the Company a Right of First Refusal to purchase all or any portion of Units that such Member may propose to transfer in a Proposed Transfer, at the same price and on the same terms and conditions as those offered to the Prospective Transferee.

(b)     Notice.  Each Member proposing to make a Proposed Transfer must deliver a Proposed Transfer Notice to the Company and to each other Member.  Such Proposed Transfer Notice shall contain the material terms and conditions (including price and form of consideration) of the Proposed Transfer and the identity of the Prospective Transferee.  To exercise its Right of First Refusal under this Section 2.1, the Company must deliver a Company Notice to the selling Member within fifteen (15) days after delivery of the Proposed Transfer Notice.

(c)     Grant of Secondary Refusal Right.  Subject to the terms of Section 3 below, each Member hereby unconditionally and irrevocably grants to the other Members a Secondary Refusal Right to purchase all or any portion of the Units not purchased by the Company pursuant to its Right of First Refusal, as provided in this Section 2.1(c).  If the Company does not intend to exercise its Right of First Refusal with respect to all Units subject to a Proposed Transfer, the Company must deliver a Secondary Notice to each Member no later than twenty (20) days after the selling Member delivers the Proposed Transfer Notice to the

Company. To exercise its Secondary Refusal Right, a Participating Member must deliver a Member Notice to the other Members and the Company no later than thirty (30) days after the Company delivers the Secondary Notice to the Member (the "**Secondary Notice Period**").

(d)    Consideration; Closing. If the consideration proposed to be paid by the Prospective Transferee for the Units is in property, services or other non-cash consideration, the Fair Market Value of the consideration shall be as determined in good faith by the Board and as set forth in the Company Notice. If the Company or any Participating Member cannot for any reason pay for the Units in the same form of non-cash consideration, the Company or such Member may pay the cash value equivalent thereof as set forth in the Company Notice. The closing of the purchase of Units by the Company and the Participating Members shall take place, and all payments from the Company and the Participating Members shall have been delivered to the selling Member, by no later than ninety (90) days after delivery of the Proposed Transfer Notice.

2.2    Tag Along Right.

(a)    Exercise of Right. If any Units subject to a Proposed Transfer is not purchased pursuant to Section 2.1 above and if such a Proposed Transfer would result in more than fifty percent (50%) of the Units being sold to a Prospective Transferee, any other Member may elect to exercise its Tag Along Right and participate on a pro rata basis in the Proposed Transfer on the same terms and conditions specified in the Proposed Transfer Notice. Each Member who desires to exercise its Tag Along Right must give the selling Member written notice to that effect (a "**Tag Along Notice**") within fifteen (15) days after the deadline for delivery of the Secondary Notice described above, and upon giving such notice such Member shall be deemed to have effectively exercised its Tag Along Right.

(b)    Purchase and Sale Agreement. The Members hereby agree that the terms and conditions of any sale pursuant to this Section 2.2 will be memorialized in, and governed by, a written purchase and sale agreement with customary terms and provisions for such a transaction and the Members further covenant and agree to enter into such an agreement as a condition precedent to any sale or other transfer pursuant to this Section 2.2.

2.3    Additional Compliance.

(c)    Additional Compliance.    If any Proposed Transfer is not consummated within ninety (90) days after receipt of the Proposed Transfer Notice by the Company, the Members proposing the Proposed Transfer may not sell any Units unless they again first comply in full with each provision of Section 2.1. The exercise or election not to exercise any right by any non-transferring Member under Section 2.1 shall not adversely affect its right to participate in any other sales of Units subject to Section 2.2.

(a)    Transfer Void; Equitable Relief. Any Proposed Transfer not made in compliance with the requirements of this Agreement shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent and shall not be recognized by the Company. Each Member hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other Members hereto for which monetary damages alone

4

Confidential    Exhibit A.13

could not adequately compensate.   Therefore, the Members hereto unconditionally and irrevocably agree that any non-breaching Member hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Units not made in strict compliance with this Agreement).

2.4     Exempted Transfers.   Notwithstanding the foregoing or anything to the contrary herein, the provisions of Sections 2.1 and 2.2 shall not apply:   (a) in the case of a Member that is an entity, upon a transfer by such Member to its members, partners or other equity holders, or (b) in the case of a Member that is a natural person, upon a transfer of Units by such Member made for bona fide estate planning purposes, either during his or her lifetime or on death by will or intestacy to his or her Immediate Family Members, or any other relative approved by the Board, or any custodian or trustee of any trust, partnership or limited liability company for the benefit of, or the ownership interests of which are owned wholly by, such Member or any such Immediate Family Members, provided that in the case of clause(s) (a) or (b), the Member shall deliver prior written notice to the other Members of such pledge, gift or transfer and such Units shall at all times remain subject to the terms and restrictions set forth in this Agreement and such transferee shall, as a condition to such issuance, deliver a counterpart signature page to this Agreement as confirmation that such transferee shall be bound by all the terms and conditions of this Agreement as a Member (but only with respect to the securities so transferred to the transferee), including the obligations of a Member with respect to Proposed Transfers of such Units pursuant to Section 2.1 and Section 2.2; and provided, further, in the case of any transfer pursuant to clause (a) or (b) above, that such transfer is made pursuant to a transaction in which there is no consideration actually paid for such transfer.

2.5     Exempted Offerings.   Notwithstanding the foregoing or anything to the contrary herein, the provisions of Section 2.1 and Section 2.2 shall not apply to the sale of any Units that constitute a Sale of the Company.

3.     Rights to Future Units Issuances.

3.1     Right of First Offer.   Subject to the terms and conditions of this Section 3.1 and applicable securities laws, if the Company proposes to offer or sell any New Securities (other than a dividend on outstanding Units), the Company shall first offer all such New Securities to each Member.  A Member shall be entitled to apportion the right to purchase such New Securities hereby granted to that Member.

(a)     The Company shall give notice (the "**Offer Notice**") to each Member, stating (i) its bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which it proposes to offer such New Securities.

(b)     By notification to the Company within twenty (20) days after the Offer Notice is given, each Member may elect to purchase or otherwise acquire, at the price and on the terms specified in the Offer Notice, up to that portion of such New Securities which equals the proportion that the Units issued and held by such Member bears to the total Units of the Company then outstanding held by the Members.  At the expiration of such twenty (20) day

Confidential                    Exhibit A.13
WAI-783212245V2

period, the Company shall promptly notify each Member that elects to purchase or acquire all the Units available to it (each, a "**Fully Exercising Member**") of any other Member's failure to do likewise. During the ten (10) day period commencing after the Company has given such notice, each Fully Exercising Member may, by giving notice to the Company, elect to purchase or acquire, in addition to the number of Units specified above, up to that portion of the New Securities for which the other Members were entitled to subscribe. The closing of any sale pursuant to this Section 3.1(b) shall occur within the later of ninety (90) days of the date that the Offer Notice is given or the date of initial sale of New Securities pursuant to Section 3.1(c).

(c)    If all New Securities referred to in the Offer Notice are not elected to be purchased or acquired as provided in Section 3.1(b), the Company may, during the ninety (90) day period following the expiration of the periods provided in Section 3.1(b), offer and sell the remaining unsubscribed portion of such New Securities to any Person or Persons at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Offer Notice. If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within thirty (30) days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Securities shall not be offered unless first reoffered to the Members in accordance with this Section 3.1.

4.    Drag-Along Right.

4.1    Actions to be Taken. In the event that the holders of more than seventy-five percent (75%) of the Units propose to sell their Units (the "**Selling Members**"), and such sale is conditioned upon the sale of the remaining Units of the Company ("**Sale of the Company**"), then each Member hereby agrees:

(a)    to sell the Units beneficially held by such Member to the Person to whom the Selling Members propose to sell their Units, and, except as permitted in Section 4.2 below, on the same terms and conditions as the Selling Members; and

(c)    to execute and deliver all related documentation and take such other action in support of the Sale of the Company as shall reasonably be requested by the Company or the Selling Members in order to carry out the terms and provision of this Section 4.1, including without limitation executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, and any similar or related documents.

4.2    Exceptions. Notwithstanding the foregoing, a Member will not be required to comply with Section 4.1 above in connection with any proposed Sale of the Company (the "**Proposed Sale**") unless:

(a)    the Member shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the Proposed Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the

6

Company as well as breach by any Member of any of identical representations, warranties and covenants provided by all Members);

    (b)    liability shall be limited to such Member's applicable percentage Units, except with respect to claims related to fraud or intentional misrepresentation;

    (c)    upon the consummation of the Proposed Sale, each holder of Units will receive the same form of consideration for their Units as is received by other holders in respect of their Units; and

    (d)    subject to clause (c) above, if any holders of any Units of the Company are given an option as to the form and amount of consideration to be received as a result of the Proposed Sale, all holders of Units will be given the same option.

5.    Miscellaneous.

    5.1    Successors and Assigns. Other than as set forth in this Section 5.1, no party to this Agreement may assign this Agreement without the written consent of the other parties. The rights under this Agreement may be assigned (but only with all related obligations) in accordance with Section 2.4. The terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and permitted assignees any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

    5.2    Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

    5.3    Counterparts; Facsimile. This Agreement may be executed and delivered by facsimile or electronically, in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

    5.4    Headings. The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

    5.5    Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (i) personal delivery to the party to be notified; (ii) when sent, if sent by electronic mail or facsimile during the recipient's normal business hours, and if not sent during normal business hours, then on the recipient's next business day; (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one (1) business day after the business day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next-day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the addresses, email addresses, or facsimile numbers provided from time to time.

Confidential
WAI 7652122 v2

Exhibit A.13

5.6    Amendments and Waivers. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance, and either retroactively or prospectively) only with the written consent of the Company and each of the Members; provided that any provision hereof may be waived by any waiving party on such party's own behalf, without the consent of any other party. No waivers of or exceptions to any term, condition, or provision of this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such term, condition, or provision.

5.7    Severability. In case any one or more of the provisions contained in this Agreement is for any reason held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement, and such invalid, illegal, or unenforceable provision shall be reformed and construed so that it will be valid, legal, and enforceable to the maximum extent permitted by law.

5.8    Additional Members. Notwithstanding anything to the contrary contained herein, if the Company issues additional Units after the date hereof, whether pursuant to a subscription agreement or otherwise, any purchaser of such Units may become a party to this Agreement by executing and delivering an additional counterpart signature page to this Agreement, and thereafter shall be deemed a "Member" for all purposes hereunder. No action or consent by the Members shall be required for such joinder to this Agreement by such additional Member, so long as such additional Member has agreed in writing to be bound by all of the obligations as a "Member" hereunder.

5.9    Recitals. The recitals of this Agreement are incorporated into and made part of the terms of this Agreement.

5.10    Entire Agreement. This Agreement constitutes the full and entire understanding and agreement among the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

**[Remainder of Page Intentionally Left Blank]**

8

WA1-7832(224)v2
Confidential                    Exhibit A.13

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**COMPANY**

S.G.R. LLC, GOVERNMENT RELATIONS AND LOBBYING

By: _____

Name: _____

Title: _____

**MEMBERS**

SPHERE CONSULTING LLC

By: _____

Name: _____

Title: _____

WOODLAND DRIVE LLC

By: _____

Name: _____

Title: _____

Confidential                    Exhibit A.13

WAI-783212243v2

## SECURITY AGREEMENT

**DATE**: _____ ___, 2015

**SECURED PARTY**: Woodland Drive LLC ("**Investor**")

**GRANTOR**: James Courtovich ("**Courtovich**")

### BACKGROUND:

Investor has invested Four Million Dollars ($4,000,000) ("**Loan**") into S.G.R. LLC, Government Relations and Lobbying, a Delaware limited liability company (the "**Company**"). Investor has agreed that up to Two Million Dollars ($2,000,000) of the Loan ("**Real Estate Loan**") shall be used to purchase real estate in Washington, D.C. (the "**Real Estate**") in the name of Courtovich as evidenced by the Operating Agreement of the Company, dated _____ ___, 2015 (the "**Operating Agreement**")

Courtovich agrees to grant Investor a security interest in the Real Estate to secure the performance and observation by Company of all of the covenants, obligations, representations and warranties related to the Real Estate Loan, evidenced by the Operating Agreement and by this Security Agreement (collectively referred to herein as the "**Obligations**").

### AGREEMENTS:

In consideration of the premises and mutual covenants and promises contained herein, the parties named above agree as follows:

1. Application of UCC. "**UCC**" means the Uniform Commercial Code as the same may from time to time be in effect in the District of Columbia; *provided, however,* in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of Investor's security interest in any "**Collateral**" (as defined in Section 2 below) is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the District of Columbia, the term "**UCC**" shall mean the Uniform Commercial Code as in effect at such time in such other jurisdiction for purposes of the provisions hereof. Unless otherwise defined in this Security Agreement, all terms defined in the Uniform Commercial Code and used herein shall have the same definitions herein as specified therein whether or not such term is capitalized.

2. Grant of Security Interest. In order to secure payment and performance of the Obligations, Courtovich hereby grants to Investor a security interest in the Real Estate (referred to herein as the "**Collateral**").

WAI-783242656v2
Confidential                                  Exhibit A.13

3.   Courtovich's Representations, Warranties and Covenants. Courtovich represents, warrants and covenants that:

   a. Courtovich has full power and authority to execute this Security Agreement and to subject the Collateral to the security interest created hereby;

   b. This Security Agreement and the Operating Agreement have been duly authorized by all necessary action;

   c. Courtovich authorizes Investor to file at any time, and from time to time, financing statements and amendments thereto or other similar instruments, and perform such acts as Investor reasonably may request to establish and maintain a valid and properly perfected security interest in the Collateral;

   d. Courtovich will keep accurate and complete records of the Collateral at all times and permit Investor to inspect the records and the Collateral at all reasonable times. Upon request of Investor, Courtovich will furnish such reports and statements as Investor reasonably may request with respect to the Collateral; and

4.   Other Covenants of Courtovich.  So long as any of the Obligations, including under the Operating Agreement or this Security Agreement or any part thereof, remains unpaid or unperformed, Courtovich further covenants and agrees that:

   a. Courtovich shall not sell or otherwise transfer or dispose of the Collateral without prior notice to and consent of the Investor;

   b. Courtovich shall promptly pay all taxes and other governmental charges' levied or assessed upon or against any Collateral;

   c. Courtovich shall keep the Collateral free and clear from all claims, liens or encumbrances, except for the security interest granted hereby or otherwise consented to by Investor; and

5.  Events of Default. Courtovich shall be in default under this Security Agreement upon the happening of any of the following events (each an "**Event of Default**"):

   a. Any representation or warranty made by Courtovich in this Security Agreement proves to be materially false or misleading;

   b. Courtovich materially breaches any of his other covenants, obligations or duties under this Security Agreement and such default remains uncured after the expiration of any cure period, if applicable, following written notice of such default if required;

2

WAI-783212655v2
Confidential                         Exhibit A.13

c. Courtovich files a petition in bankruptcy, insolvency or receivership; or if such petition is filed against Courtovich and is not dismissed within thirty (30) days of filing; or if Courtovich makes an assignment for the benefit of creditors; or

d. A garnishment, summons or a writ of attachment is issued against or served upon Investor regarding the attachment of any property of Courtovich or any indebtedness owing to Courtovich and is not dismissed within thirty (30) days of filing or otherwise consented to by Investor.

6.    Remedies Upon Default. Upon the occurrence of an Event of Default as set forth in the preceding paragraph and such Event of Default remains uncured after the applicable cure period following written notice of default, Investor may exercise any and all of the following remedies provided hereunder or under applicable law. No exercise of any one or more of such remedies shall preclude Investor from exercising any other such remedy at the same time or any other time. Investor may:

a. Declare the balance of Real Estate Loan to be paid under the Operating Agreement, to be due and payable immediately; and

b. Exercise any and all of the remedies of a Investor under the Uniform Commercial Code with respect to the Collateral, including the right to offer and sell the Collateral privately to purchasers. If notice to Courtovich is required by law in a particular instance, such notice shall be deemed to be commercially reasonable if given at least ten (10) calendar days prior to the date of the intended disposition or other action. Courtovich will pay any deficiency that may remain after exercise of such rights. All of Investor's rights hereunder are cumulative and no waiver of any default shall affect any subsequent default.

7.    No Waiver. Waiver by Investor of any default of Courtovich hereunder shall not be a waiver of any default or of the same default on a later occasion. No delay or failure by Investor to exercise any right or remedy shall be a waiver of such right or remedy. No single or partial exercise by Investor of any right or remedy shall preclude other or further exercise of such right or remedy at any other time.

8.    Notices.  All notices to be given to Courtovich shall be deemed sufficiently given if delivered by courier, or mailed, emailed or faxed with receipt acknowledged, to Courtovich at the most recent address shown on Investor's records.

10.    Survival. All representations, warranties and covenants contained in this Security Agreement shall survive the execution, delivery and performance of this Security Agreement and the creation and payment of the Obligations.

11.    Modification. No waiver, modification, amendment or termination of this Security Agreement or any provision hereof shall be effective unless contained in a writing signed by the party to be bound thereby.

3

WAI-7832 2655v2

Confidential                    Exhibit A.13

12. <u>Successors and Assigns</u>. This Security Agreement shall be binding upon and inure to the benefit of Courtovich and Investor and their respective heirs, representatives, successors and assigns.

13. <u>Applicable Law</u>. This Security Agreement and all rights and obligations hereunder shall be governed by and interpreted under the laws of the State of Delaware, without application of any choice of law considerations.

14. <u>Entire Security Agreement.</u> This Security Agreement represents the only agreement among the parties concerning the subject matter hereof and supersedes all prior agreements, whether written or oral, relating thereto. Copies of this Security Agreement with signatures transmitted electronically (e.g., by facsimile or pdf) shall be deemed to be original signed versions of this Security Agreement.

[SIGNATURE PAGE FOLLOWS]

4

WAI-783212655v2

Confidential                    Exhibit A.13

IN WITNESS WHEREOF, the parties have executed this Security Agreement as of the day and year first written above.

**GRANTOR**

JAMES COURTOVICH

By: _____

**SECURED PARTY**

WOODLAND DRIVE LLC

By: _____

Name: _____

Title: _____

5

Confidential                    Exhibit A.13