**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WOODLAND DRIVE LLC<br><br>Plaintiff,<br><br>v.<br><br>JAMES COURTOVICH<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:19-cv-00750-CJN |

**DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Defendant, James Courtovich ("Defendant"), respectfully files this Opposition to Plaintiff Woodland Drive LLC's ("Plaintiff") Motion for Summary Judgment.

## I.   INTRODUCTION

This case arises from a partially failed business plan involving the Defendant, James Courtovich, members of the extended Saudi Arabian Al Gosaibi family, and Simon Charlton, an officer of one of the Al Gosaibi family companies. As of late 2014, Courtovich, through his company, Sphere Consulting, and Charlton, had worked cooperatively on a matter relating to certain Al Gosaibi, business ventures. At that time, legal issues related to allegations of fraud against members of the Al Gosaibi family led Courtovich and Charlton to discuss a business venture involving protection of some of the Al Gosaibi property assets. When Courtovich declined to be involved in that venture, Charlton and Courtovich began discussing a different venture with funding provided by the Al Gosaibi family. However, the parties were never able to achieve a meeting of the minds on all the essential terms of the deal. Most importantly, Courtovich did not agree to structuring the funding as a loan to Courtovich on which he would be required to pay

exorbitant interest to an entity controlled by the Al Gosaibi family and Charlton. Additionally, other unforeseen events caused significant problems with the possible success of the proposed planned business operations. This fundamental disagreement over the parties' responsibilities and rights related to the planned business and regarding the funding of the business led to this lawsuit.

## II.    STATEMENT OF FACTS

The Defendant, James Courtovich, has headed a successful public affairs and crisis communication firm, Sphere Consulting LLC, in Washington, D.C., for more than twenty years. As part of his work, he developed a business and personal relationship with members of the Saudi Arabian Al Gosaibi family. His work involved him in representations of the Almad Hamad Al Gosaibi & Brother Company, ("AHAB"), a family-owned holding business group that engaged in the international financial and manufacturing business. Beginning in 2009, AHAB became involved in multi-international, multi-billion lawsuits involving part of its business. AHAB retained Courtovich to help with its public relations. Through this work, Courtovich became friends with AHAB's Chief Restructuring Officer, Simon Charlton.

In approximately 2014, Courtovich was asked if his company would "take a position in the family's assets in Great Britain to protect them against collection from HSBC," a British multi-international bank involved in the various lawsuits against AHAB. Courtovich Deposition Transcript, p.9. ("Courtovich Deposition"), Defendant's Exhibit 1. Mr. Courtovich declined this request but that request led to a discussion between Courtovich and Charlton about expanding Courtovich's consulting business through an investment by the Al Gosaibi family. Courtovich outlined his proposal to Charlton in a December 4, 2014, email. Defendant's Exhibit 2. From the outset, Courtovich envisioned an approximately four-million-dollar equity investment by the Al Gosaibi family that would provide approximately two million dollars to purchase property in

Washington, D.C., for the business, and two million dollars for expansion of Sphere Consulting through a subsidiary called S.G.R. LLC, Government Relations and Lobbying.

From the beginning, Courtovich proposed that the businesses real property would be held in his name to meet FEC "policies on entertainment of public officials" but that he would "pledge that asset…to the **investor** in SGR, the subsidiary company of Sphere." (Emphasis added). Defendant's Exhibit 2.  In effect, Courtovich envisioned the investor, the Al Gosaibi family, to be, in effect, the beneficial owner of the property, which would, at some point, assume record ownership of the property.  Courtovich proposed that "the investment" in the business operations "be structured as a loan to minimize tax obligations" but not a loan of which he would pay interest. Defendant's Exhibit 2.  Courtovich also believed that by having the deal terms include "loans," it would assist Charlton in making the proposal "presentable to the [AHAB] board to get approved." (Courtovich Deposition at 54, Defendant's Exhibit 1).  Courtovich believed that "the interest would be waived "as he had done on similar business deals with other clients."  Courtovich Deposition at 53-55, Defendant's Exhibit 1.

Initially, Charlton told Courtovich that the AHAB Board "is supportive of the idea." Defendant's Exhibit 3.  Courtovich then had a term sheet prepared and had it sent to Charlton on February 14, 2015.  Defendant's Exhibit 4.  However, to Courtovich's surprise, Charlton told him that the deal had been rejected.  Similarly, Courtovich had his lawyers send over several draft agreements related to the deal.  These were also rejected.  Courtovich Deposition at 24, Defendant's Exhibit 1.  As a result, several parts in the proposed business plan by Courtovich were never implemented because "this proposal…was never agreed upon."  Courtovich Deposition at 31, Defendant's Exhibit 1.  Although Courtovich had been told that the documents his lawyers had prepared had been rejected, on March 9, 2015, the Al Gosaibi general counsel, Brett Walter, wrote

3

to Courtovich's lawyer that "Simon [Charlton] has signed the drafts (undated)" but acknowledged: "Obviously, this is a little out of order as I'm not sure the LLC [Woodland Drive LLC, plaintiff in this matter] has been formed yet." Defendant's Exhibit 5. Also, four million dollars was wired by an English solicitor for AHAB into a bank account of Courtovich.

Although Courtovich believed that they "never had an agreement or something that was confirmed by both parties," and he did not countersign the documents Walter had sent at that time, he began working to create the SGR business. Courtovich Deposition at 20, Defendant's Exhibit 1. He arranged for the purchase of a business property at 625 Massachusetts Avenue, NE, Washington, D.C., and began to work on the business expansion. However, Courtovich encountered two major problems. First, neighbors complained that Courtovich was operating a business in an area zoned for residential use only and obtained a cease-and-desist order against the business. Courtovich Deposition at 61, Defendant's Exhibit 1. Second, and more importantly, one of Sphere's major clients committed suicide while being investigated for embezzling funds from his company. The subsequent loss of revenue from that client and publicity disrupted Courtovich's business. Courtovich Deposition at 45, Defendant's Exhibit 1. As a result, the expansion of the business through SGR was impeded. To date, the only part of the original business proposal that has been achieved in full is the purchase of the business property, which is owned by Courtovich but whose ownership he acknowledges should be at some point be transferred to the Plaintiff.

## III.    MATERIAL FACTS IN DISPUTE

1.    From the beginning, Courtovich proposed that the business property would be held in his name to meet FEC "policies on entertainment of public officials" but that he would "pledge that asset…to the investor in SGR, the subsidiary company of Sphere." Defendant's Exhibit 2. Courtovich proposed that "the investment" in the business operations "be structured as a loan to

minimize tax obligations." Defendant's Exhibit 2. Courtovich also believed that by having the deal terms include loans, it would assist Charlton in making the proposal "presentable to the [AHAB] board to get approved." However, Courtovich believed that "the interest would be waived." Courtovich Deposition at 54, Defendant's Exhibit 1.

2.    Courtovich then had a term sheet prepared and had it sent to Charlton on February 14, 2015. Defendant's Exhibit 4. However, to Courtovich's surprise, Charlton told him that the deal had been rejected. Similarly, Courtovich had his lawyers send over several draft agreements. Those were also rejected. Courtovich Deposition at 24, Defendant's Exhibit 1. As a result, several acts in the proposed business plan by Courtovich were never implemented because "this proposal…was never agreed upon." Courtovich Deposition at 31, Defendant's Exhibit 1. Although Courtovich had been told that the documents his lawyers had prepared had been rejected, on March 9, 2015, the Al Gosaibi general counsel, Brett Walter, wrote to Courtovich's lawyer that "Simon [Charlton] has signed the drafts undated" and acknowledged: "Obviously, this is a little out of order as I'm not sure the LLC [Woodland Drive LLC, the Plaintiff in this matter] has been formed yet." Defendant's Exhibit 5.

3.    Although Courtovich believed that they "never had an agreement or something that was confirmed by both parties," and he did not countersign the documents Walter sent, he began working to create the SGR business. Courtovich Deposition at 20, Defendant's Exhibit 1. He arranged for the purchase of a business property at 625 Massachusetts Avenue, NE, and began to work on the business.

4.    The fundamental disagreement over the proposed contract terms was whether the four million dollars sent to Courtovich represented a loan by the Al Gosaibi family to Courtovich an investment by the Al Gosaibi family in which they obtained real property in the District of

Columbia and a partial equity interest in the planned expansion of Courtovich's consulting business into the new subsidiary of Sphere Consulting, SGR. Courtovich Deposition at 53-55, Defendant's Exhibit 1.

5. The draft proposal documents, the various correspondence exchanged by the principals, and the conversations between Courtovich and Charlton refer to the transaction variously as a loan, an investment to obtain equity, or a combination of both. Defendant's Exhibits 7, 8, 9, and 10. Courtovich believed that the money was an investment by the Al Gosaibi family in which they obtained assets in the United States. Courtovich Deposition at 13, Defendant's Exhibit 1.

6. At the outset, Courtovich and Charlton understood and intended that the four million dollars be used to create a more valuable expansion of Courtovich's existing firm to provide profits to both of them, and the beneficiaries of the Al Gosaibi family. Although not stated in any of the draft documents, Charlton believed he would receive a ten percent equity interest in the new SGR business as a result of his "sweat equity." Charlton Deposition at 81, Defendant's Exhibit 6. To simultaneously protect the interest of the Al Gosaibi family and deal with United States laws and appearance, the real property would be put in Courtovich's name but Al Gosaibi family would be given a security interest in the property. As Courtovich testified, the property would be put in his name to address the public relation of running a lobbying business in a residential neighborhood. Courtovich Deposition at 60, Defendant's Exhibit 1; Defendant's Exhibit 11.

7. To address both American tax issues and assist Courtovich in convincing the AHAB Board to approve the transaction, the parties agreed that the two million dollars to be used for business expansion would also be characterized as a loan. However, as Courtovich testified,

he saw the real substance of the transaction as the Al Gosaibi family obtaining a house in the United States and purchasing a forty-nine percent equity share of the new business and its expected profits. As Courtovich testified, he believed the interest payments would be waived. Courtovich Deposition at 54, Defendant's Exhibit 1. As Courtovich explained, he and Charlton had a conversation, in which both agreed that the interest payments would be waived: "As I answered, that was a verbal agreement [to waive fees]. The documents were written for the board's approval. Only an idiot would pay 12 percent or 8 percent interest." Courtovich Deposition at 82, Defendant's Exhibit 1.

8.      Also, because of the lack of agreement as to the terms of the proposal, Courtovich did not sign the security agreement until some time in 2016, after he had taken out a mortgage on the property. Defendant's Exhibit 11.

9.      Courtovich did not make a one-million-dollar payment because he and Charlton did not come to an agreement. Courtovich Deposition at 58, Defendant's Exhibit 1.

10.      Of the four million dollars sent by AHAB, Courtovich spent approximately $2,248,500 on the property to be used for the business at 625 Massachusetts Avenue, N.E. Defendant's Exhibit 7. Courtovich spent the remaining funds to expand his lobbying business through the planned subsidiary, SGR. Courtovich Deposition at 93-105, Defendant's Exhibit 1.

## IV.    ARGUMENT

### A.    The Parties Had Not Agreed Upon All Material Terms Of The Proposal At The Time The Money Was Sent To Courtovich's Bank And They Have Not Subsequently Agreed Upon These Terms.

In order for the valid contract to exist between two parties, the parties must agree on all material terms of the proposed contract. Such agreement did not exist between Courtovich and the Al Gosaibi counterparty, Woodland, at the time the executives, Charlton and Walter at AHAB, directed their English solicitor to wire four million dollars to Courtovich's bank. At that time, all

7

documents exchanged by the parties were preliminary drafts, and, as Courtovich testified, the Al Gosaibi family representatives had rejected all the drafts prepared by Courtovich. Courtovich Deposition at 18, Defendant's Exhibit 1. Even the documents Simon Charlton signed on or about March 9, 2015, were draft documents that he had told Courtovich had been rejected. Courtovich Deposition at 25, Defendant's Exhibit 1, also Defendant's Exhibit5. Moreover, the supposed counterparty entity, Woodland Drive, LLC, the Plaintiff, did not exist at that time.[1]

However, the fundamental disagreement over the proposed contract terms was whether the four million dollars sent to Courtovich represented a loan by the Al Gosaibi family to Courtovich, an investment by the Al Gosaibi family in which they obtained real property in the District of Columbia and a partial equity interest in the planned expansion of Courtovich's consulting business into the new subsidiary of Sphere Consulting, SGR. The draft proposal documents, various correspondence exchanged by the principals, and the conversations between Courtovich

---

[1] It is likely that the unusual nature of this transaction resulted from the initial genesis of discussion: that the Al Gosaibi family wanted to put assets beyond the reach of creditors, as Courtovich testified, and that the real beneficiaries of Woodland Drive, LLC were the children of a branch of the Al Gosaibi family. As Charlton testified:

> "We were pretty careful. Particularly by '18, most new investments that we made on behalf of the family were through the children because the parents and the older generations were mired in litigation. So we were trying to structure deals through the children and off shore holding companies that were beneficially owned by the children. So ultimately it would've been the children who benefited."

> "Q You're not answering my question…Who were the intended beneficiaries?
> A The children of the Al Gosaibi family including the Ghamdis.
> Q Okay. Who were they?
> A There's hundreds of them.
> Q So hundreds of children were the intended beneficiaries is what you're saying?
> A Maybe not hundred. Maybe I overstated. But yeah, the children of the family. We were trying to build investments and provide for the future of the family, which would be the children and the grandchildren of the Al Gosaibi partner. They were the ultimate beneficiaries, yeah."
> Charlton Deposition at 70-73, Defendant's Exhibit 6.

and Charlton refer to the transaction variously as a loan, an investment to obtain equity, or a combination of both.

At the outset, Courtovich and Charlton understood and intended that the four million dollars be used to create a more valuable expansion of Courtovich's existing firm to provide profits to both of them and to the beneficiaries of Woodland Drive LLC designated by the Al Gosaibi family. Although not stated in any of the draft documents, Charlton believed he would receive a ten percent equity interest in the new SGR business as a result of his "sweat equity." Charlton Deposition at 81, Defendant's Exhibit 5. Charlton and Courtovich believed that the money would be used in two ways: two million dollars would be used to purchase property out of which the business would be run and two million dollars would be used for the expansion of the business through added personnel and resources. To simultaneously protect the interest of the Al Gosaibi family and deal with United States laws and public appearance issues, the parties agreed the real property would be put in Courtovich's name but Al Gosaibi family would be given a security interest in the property. The property would be put in his name to address lobbying restrictions imposed by the Federal Election Commission and the public relation problem of having a Saudi Arabian family being seen openly involved in the political lobbying business. Defendant's Exhibit 2. To address both American tax issues and assist Charlton in convincing the AHAB Board to approve the transaction, Charlton and Courtovich agreed that the four million dollars to be used for business expansion and real property would also be characterized as a loan. Courtovich Deposition at 82, Defendant's Exhibit 1. However, as Courtovich testified, he saw the real substance of the transaction as the Al Gosaibi family obtaining a house in the United States and purchasing a forty-nine percent equity share of the new business and its expected profits. As Courtovich testified, he believed the interest payments would be waived. Courtovich Deposition

9

at 81-82, Defendant's Exhibit 1.  As Courtovich explained, he and Charlton had a conversation, in which both agreed that the interest payments would be waived: "As I answered, that was a verbal agreement [to waive fees].[2]  The documents were written for the board's approval.  Only an idiot would pay 12 percent or 8 percent interest."  Courtovich Deposition at 82, Defendant's Exhibit 1.

Based on the actual transactions, Courtovich's understanding that the proposed interest rate payments would not be made makes logical and economic sense.  If the parties intended Courtovich to purchase the D.C. property for the ultimate benefit of the Al Gosaibi family, then the purchase of the property would not benefit Courtovich, and no reason would exist for him to pay interest to the Al Gosaibi family for the right to purchase property for them.  Similarly, if by the Al Gosaibi family providing the two million dollars for the proposed expansion of SGR's business, they would obtain a forty-nine percent interest in the business, it would not make economic sense for Courtovich to also pay interest to the family in addition to also giving them an almost half-interest in the business.

The documentary and testimonial evidence by the Plaintiff's representative, Charlton, also demonstrates that Charlton did not clearly describe the financial transaction as a loan as opposed to the Al Gosaibi family's purchase of real property interest and a partial business interest in the United States.  In his testimony, and in related exhibits, Charlton described this financial transaction or its parts as an investment.  For example (all emphasis added):

- On June 19, 2016, Charlton wrote Courtovich: "Jim, one of the things we need to agree is the amount of the promissory note for the **investment** in real estate and therefore the amount of security that needs to be put in place."  Defendant's Exhibit 7.

---

[2] Courtovich testified earlier that he wrote Charlton stating that they should "talk by phone…because we have to go back to the waiving interest and our agreement."  Courtovich Deposition at 81, Defendant's Exhibit 1.

- In March 2015, Charlton explained to the AHAB lawyer in London regarding the money to be wired to Courtovich: "It is for an **investment** in a lobbying business, including the purchase of a piece of real estate up on the [H]ill for up to $2 million." Defendant's Exhibit 8.

- Charlton testified that he would regularly update the Al Gosaibi Board that "ran AHAB" and, "effectively acted as sort of any **investment** company…on what was going on with all the businesses, **investments**, everything." Charlton Deposition at 136-137, Defendant's Exhibit 5. On March 18, 2016, Charlton wrote Courtovich that he would need to report to "my Board on the development of SGR…I won't get into it here but as we were when we **invested** a year ago we remain committed to and like this **investment** and want to pursue it and see it work. The initial aim was to **invest** approximately half of the money in the property…with the other half to be used for working capital…." Defendant's Exhibit 9.

- On June 2016, Charlton wrote Courtovich: "We **invested** US $4 million in March 2015; and described it as "AHAB's **investment**." Defendant's Exhibit 10.

Based on these facts, a significant disputed issue of material fact exists as to whether the parties agreed to an essential material fact regarding the terms of the proposed contract. Under Delaware law such a disagreement prevents the contract from being formed. "[M]aterial provisions of an agreement can be so indefinite that the agreement will not be enforced." *Hindes v. Wilmington Poetry Society,* Del.Ch., 138 A.2d 501, 503 (1958); *accord* J. Calamari & J. Perillo, *Contracts* § 2-9, at 53 (3d ed. 1987). "The material terms are uncertain where they fail to provide a reasonable basis for determining the existence of a breach and for giving the appropriate remedy." *Litle v. Waters*, 1992 WL 25758, at *6 (Del. Ch. Feb. 11, 1992) (citing *Restatement*

*(Second) of Contracts* § 33(2), at 92 (1981); R. Lord, 1 *Williston on Contracts* § 4.18, at 414 (4th ed. 1990)).[3]

Taking all inferences in favor of the Defendant Courtovich, a jury could reasonably conclude that the parties failed to reach a meeting of the minds as to whether the financial transaction was a loan, an equity investment, or some combination of the two. Accordingly, the Plaintiff's Motion for Summary Judgment for breach of contract should be denied.

**B.    Defendant Courtovich Did Not Defraud Plaintiff Woodland Drive LLC**

As Plaintiff concedes, to prevail on a motion for summary judgment claiming fraud, it must present evidence sufficient to show by clear and convincing evidence that Courtovich intentionally or with reckless disregard for the trust defrauded Plaintiff. The Plaintiff has failed to present evidence that Courtovich has defrauded it.

First, assuming *arguendo* some part of Plaintiff's argument that the parties had agreed on some contract terms, Courtovich clearly performed many of the acts that Plaintiff alleges he was obligated to perform. First, Plaintiff states that of the four million dollars it had sent to Courtovich, he was to use approximately two million dollars to purchase property. It is undisputed that Courtovich did purchase and renovated the real property to be used for the business at 625 Massachusetts Avenue, N.E. at a cost of approximately $2,248,500. Defendant's Exhibit 6. Plaintiff also requested that Courtovich grant it a security interest in the property, which he did. Defendant's Exhibit 11.

---

[3] Under D. C. law, an enforceable contract "must be sufficiently definite as to its material terms ... that the promises and performance to be rendered by each party are reasonably certain[,]" and "the contract provides a sufficient basis for determining whether a breach has occurred and for identifying an appropriate remedy." *Rosenthal v. National Produce Co., Inc.,* 573 A.2d 365, 369 n. 9 (D.C.1990); accord, *Auger v. Tasea Inv. Co.,* 676 A.2d 18, 23 n. 6 (D.C.1996) ("A contract will be unenforceable if its terms are so uncertain that a court cannot accurately assess damages."). A contract is not formed unless the parties agree to all material terms. *Paul v. Howard Univ.,* 754 A.2d 297, 311 (D.C. 2000.)

Similarly, Plaintiff alleges Courtovich agreed to use approximately two million dollars to expand his lobbying business through the planned subsidiary, SGR.  In his deposition, Courtovich testified that he did use these funds to expand the business.  Courtovich Deposition at 93-114, Defendant's Exhibit 1.  Further, at Charlton's request, Courtovich directed his accountant to prepare a document showing the use of the funds, which she did.  Plaintiff's Exhibit B.1to its Motion.  Based on this evidence viewed in the light most favorable to Courtovich and drawing all inference in his favor, the Plaintiff has failed to prove Courtovich committed fraud.

C.    **Courtovich Did Not Wrongfully Convert Plaintiff's Property.**

Under Delaware law, conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of the [the plaintiff's] right, or inconsistent with it. *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933). To sustain a claim for conversion, the Plaintiff has the burden to prove: "(1) a right to the property; (2) an absolute and unconditional right to immediate possession of the property; (3) a demand for possession; and (4) that the defendant wrongfully and without authorization assumed control, dominion, or ownership of the property." *Van Diest Supply Co. v. Shelby Cnty. State Bank*, 425 F. 3d 437, 439 (7th Cir. 2005). Plaintiff first argues that Courtovich has wrongfully taken or retained the 625 Massachusetts Avenue, NE, property in violation of Plaintiff's right.  This claim must be rejected as a matter of law. Under both Delaware law and District of Columbia law the doctrine of conversion does not apply to real property. *Cornell Glasgow, LLC v. LaGrange Properties, LLC*, 2012 WL 3157124, at *5 (Del. Super. Ct. Aug. 1, 2012) (citing *Stevanov v. O'Connor,* 2009 WL 1059640, at * 13 (Del.Ch. Apr.21, 2009)); ("It is well-settled in Delaware that conversion applies to chattel but not to real property.") *Chen v. Bell-Smith*, 768 F. Supp. 2d 121, 150 (D.D.C. 2011) (The Courts in the District of Columbia "do not recognize claims for conversion of real property[.]").

Plaintiff also claims Courtovich committed conversion by using some of the funds for his personal use. However, as discussed above, supra at p. 12-13, the evidence shows that Courtovich did use the funds for the SGR business. For example, Courtovich testified that some of the remaining funds were spent on an event to promote the business and on a graphic designer. Courtovich Dep. at p. 104-5, Defendant Exhibit 1. Thus, at a minimum, a material issue of disputed fact exists as to whether Courtovich converted this property, and summary judgment is not proper.

**D.      The Plaintiff Has Failed To Establish That The Defendant Has Been Unjustly Enriched.**

As with its previous assertions, Plaintiff asserts that the "essential facts are not in dispute" as they relate to its claim that the Defendant has been unjustly enriched. However, as has been shown above, Defendant has shown that many issues of material fact are in dispute. While it may be shown that the Parties may be in agreement regarding certain terms of the original proposal that they discussed in late 2014 and early 2015, material factual dispute exists as to other terms. On that basis, summary judgment is not proper on the theory of unjust enrichment. Taking the facts in Courtovich's favor regarding the real property, he has done what the Plaintiff requested in 2015 regarding the purchase of real property and the expansion of his business. The evidence shows that Courtovich purchased a property to be used in the business and granted Plaintiff a security interest in the property. Defendant's Exhibit 9.[4] Similarly, the evidence shows that Courtovich

---

[4] Although Defendant granted the Plaintiff the security interest requested, Plaintiff's real issue is that it has failed to perfect this security interest. *See* Charlton Deposition at 65-66, Defendant's Exhibit 5. Also, because of the lack of agreement as to the terms of the proposal, Courtovich did not sign the security agreement until some time in 2016, after he had taken out a mortgage on the property. However, as Plaintiff stated in its motion, Courtovich has always viewed his role regarding the property as effectively holding it in his name but that he at some point will transfer ownership to Plaintiff, and he will pay off the mortgage.

used the other funds to attempt to make the SGR business profitable.  Thus, the Plaintiff has not proven, as a matter proper for summary judgment, that Defendant has been unjustly enriched.[5]

## V.     CONCLUSION

WHEREFORE, Defendant Courtovich respectfully requests that the Court deny Plaintiff's motion for summary judgment.

Respectfully submitted,

/s/ Russell D. Duncan
Russell D. Duncan, Esq. (DC Bar No. 366888)
Clark Hill PLC
1001 Pennsylvania Avenue, N.W.
Suite 1300 South
Washington, DC 20004
Telephone:   (202) 640-6657
Facsimile:   (202) 552-2377
Email:       rduncan@clarkhill.com

*Counsel for Defendant James Courtovich*

---

[5] Again, assuming *arguendo* that the Plaintiff has grounds for establishing a quasi-contract remedy, Plaintiff's Memo at 18, the Parties discussed giving Woodland a forty-nine percent interest in the SGR. For this, as with the real property, if the Court were to determine a quasi-contact has been proven an appropriate remedy would be the order Defendant to transfer the real property to Plaintiff and to give it a forty-nine percent interest in SGR.

15

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th of April 2023, a true and correct copy of the above and foregoing *Defendant's Opposition To Plaintiff's Motion For Summary Judgment* was electronically filed with the Clerk of the Court through CM/ECF, which will send notice to the following counsel of record:

> Andrew N. Cook, Esq.
> K&L Gates LLP
> 1601 K Street, N.W.
> Washington, DC 20006

*/s/ Russell D. Duncan*
Russell D. Duncan (DC Bar No. 366888)

16

J0569\389170\271399399