IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - x

WOODLAND DRIVE LLC,          :

      Plaintiff,          :

  v.                          :          Case No.

JAMES COURTOVICH,          :          1:19-cv-00750-RJL

      Defendant.          :

- - - - - - - - - - - - - x


Deposition of JAMES COURTOVICH

Washington, D.C.

Friday, February 3, 2023

9:01 a.m.


Job No.: 479094

Pages: 1 - 162

Transcribed By: Janice Willier

DEFENDANT'S EXHIBIT 1

Privileges.  It says, the founder -- I assume that's you?

A  Yes.

Q  And his team shall develop an annual business plan, shall present complete business plans to the investor, the company shall provide other business reports and updates on a periodic basis including monthly audited financial statements provided by the company's internal controller and quarterly complied financial statements and annual audit financial statements provided by company's external CPA.

So again, this was what was provided to -- this term sheet was provided to Simon before the 4 million dollars was transferred to your account?

A  It was provided and rejected, yes.

Q  Right.  Okay.  Fine.  Under this term sheet as well, if you look further down the page, it says the board of directors shall include at least one representative.  It says representatives designating the investor, correct?  Is that what it says?

the terms --

A   Proposed and rejected, yes.

Q   Right.  Yeah, let me finish my sentence. Yeah.  Great.  So these are the terms you were proposing before you received the money.  And you said yes, correct?  Correct?

A   Well, this -- yes.  This is the proposal and the rejected --

Q   Yeah.  Yeah.  Okay.  So your -- your statement -- your position is, is that the term sheet and the -- at some point in time, the term sheet and the accompanying documents were rejected?

A   Correct.

Q   Correct?  Okay.  And when were those documents -- or, when was the term sheet rejected?

A   I would have to look in -- when the counter-proposal came from them.  Because they had their documents written.  Because I can't remember the date.  But they said, no, this is not acceptable.

Q   But it's Jones Day that did all the

Transcript of James Courtovich
January 27, 2023                                    45

A   Okay.

Q   Was there a particular reason you took this mortgage out on the property?

A   Business interruption.

Q   What does that mean?

A   I'm trying to remember what date this was. 9/4/15.  That was -- we had a client who killed himself and we had to participate in an investigation.  And then -- sorry.  Yeah, business interruption.

Q   Okay.  Did you ever inform Woodland Drive or Simon Charlton that you were taking this mortgage?

MR. DUNCAN:  Objection to the form of the question.  It's compound again.

Q   Did you inform Simon Charlton prior to taking this mortgage out that you were going to do so?

A   Prior?  No.  Actually, I can't guarantee that because Simon was with me the day I got word that our client had killed himself and was aware of some of the business interruptions we were

identification.)

A   Thanks.

Q   Mr. Charlton -- I'm sorry.  Mr. Courtovich, please review Exhibit 15 and refresh your recollection as to what that is.

A   Email from Simon Charlton.

Q   Right.  Right.  Do you see reference there at the -- I think it's the 1, 2, 3, 4, 5, sixth paragraph down -- where Mr. Charlton says, my understanding at the outset was that 2 million was for the property, which is obviously what happened.  And then, the remaining 2 million would be for funding the business, either employing staff or acquiring a team.  Obviously, neither happened.  So I would appreciate an update as to what you think the way forward is.

Did you respond to that email or that inquiry?

A   Yes.  But I'm not sure if in writing or in person.

Q   All right.  How did you respond?

A   I was surprised because the agreement was

the interest rates applicable to the deal?

A   Correct.

Q   Right.  That -- those interest rates are reflected in the documents your counsel forwarded to Mr. Charlton --

A   That is correct.

Q   -- correct?

A   And -- would you like me to answer?

Q   Please.

A   And very similar which I discussed with Simon with my projects working with Forstmann Little & Company.  Forstmann would loan me money. I would get invested in his stock.  When it went public, I resold it.  He would then waive the interest and I get the proceeds.

Q   But that wasn't the deal here.

A   Well, it was never in writing.  That's the answer.

Q   If that's what you thought the deal was, why did you include references to the 12 percent and the 8 percent both in your email, the term agreement, and the operating agreement?

referring to.  I wanted to say what was going to happen to it.

Q  So you were concerned about Woodland Drive placing a lien or mortgage against the property? Is that what you were concerned about?

A  I was concerned about Capitol Hill neighbors getting access to try to demonstrate they're running a business out of a house in a residential street.  Which turns into a big problem on Capitol Hill.

Q  Well, how does Woodland Drive having a recorded interest in 625 Mass impact what you're doing at the property?

A  That's what I needed to look into --

Q  Right.

A  -- at this moment.

Q  Okay.  So is that why you hadn't signed the security agreement up to this point?

A  I can't go back in time and remember that.

Q  Okay.  You don't know?

A  Is this the document that I signed?  When did I sign it?

signature.

MR. COOK:  Okay.

MR. DUNCAN:  I don't think there's any doubt that he signed the security agreement.

BY MR. COOK:

Q  Okay.  All right.  So that's -- that's your testimony that you signed the security agreement?

A  Yeah.

Q  Okay.  Okay.  Let's go to tab 30.  So this will be Exhibit 30.

(Thereupon, Exhibit 30 was marked for identification.)

MS. HOPKIN:  Back to coordinated.

MR. COOK:  Yes.  I'm going to mess you up here shortly.

MS. HOPKIN:  I would expect nothing less.

MR. DUNCAN:  Associates are so cheeky these days.

MR. COOK:  Actually, Tara, I don't mean to mess everybody up but let's introduce tab 32 as Exhibit 30, which is the whole package.  So go to

tab 32 and hand those out and take back what you just handed out.  Yeah.  This is a better way to do it.

MS. HOPKIN:  If I can have those back I will remark them when they are introduced.  Thank you.

BY MR. COOK:

Q  Mr. Courtovich, take some time.  I want you to peruse what's been marked as Exhibit 30.

A  Okay.

Q  It's an email.  The first page of Exhibit 30 is an email from you to Kimberly Clark, who's your CFO, correct?

A  Right.

Q  And you said, hello, I think we need the details of where the money went, payroll, et cetera -- what are you talking about there?

A  In 2018?  I can't tell you.

Q  Are you possibly talking about the 4 million dollars you received related to the Woodland Drive agreement?

A  Yeah, okay.  To demonstrate of the 2

million dollars that was the investment, where that was to go, where it went in the business.

Q  Right.  Do you see in her heading -- in her email back to you, Kimberly Clark -- again, first page of Exhibit 30.  Kimberly Clark writes to you and identifies attachments and the description is, 4M disbursements detail, updated 4/2018, correct?

A  Mm-hmm.

Q  Right.  So what she's going to show you is where the 4 million dollars went?

A  Correct.

Q  Correct?

A  Well, the 2 million.

Q  Well, we'll have a chance to review.  So let's turn to the second page of that Exhibit 30.  All right.  Whoops.  Mine's upside down.  And you'll see that it's a little easier to read on the screen but -- so at the top of the page it identifies you, James Courtovich, JC Wells Fargo 3972, correct?  You see that?

A  Sure.

Q   That's what it says.  All right.

MR. COOK:  Sorry, Russell, I'm going to bring you back -- I'm going to refer you back to Exhibit 7?

MR. DUNCAN:  You know you're not paying me for this.

BY MR. COOK:

Q   And that's your wiring instructions?

A   Correct.

Q   And so the 4 million dollars went into the account that ended in number 3972, correct?

A   Correct.

Q   I just want to tie that off.  So you'll see referenced at the top of the summary page that Ms. Clark provided to you a reference to that same account, correct?

A   Correct.

Q   Okay.  Thank you.  And the first entry on that summary sheet is dated 3/9/2015, right?  And that shows the 4 million dollars deposit, correct?

A   Correct.

Q   Great.  Okay.  Now, we're going to go

through this section by section.  But the first

block are references to Kass, Mitek & Kass --

Kass, again.  A law firm, I guess --

A  That's -- that's the law firm --

Q  Your real estate lawyers?

A  Yeah.

Q  Right.  They handled the purchase on 625

625 Massachusetts Avenue?

A  And the cease and desist.

Q  And the cease and desist.  But -- so there

is a -- on 3/17/2015, there's a check in the

amount of -- or a bank originated debit of

$55,000.  What was that for?

A  I'd have to ask Kim.  I don't know.

Q  Okay.  On 3/30 there was a further deduct

of -- how much is that?  $1,681 -- no.  I can't

read that.

MR. DUNCAN:  Is it in the second column

there?  It's 556.

MR. COOK:  What's that?

MR. DUNCAN:  If it's in the second column,

the third entry down is 1,556.  And thirty-one

cents.

BY MR. COOK:

Q  Okay.  Well, it's about -- about 1.6 --
looks like about 1.6 million dollars.  Is that the
money used to purchase 625 Massachusetts Avenue?

A  I would assume so with that amount.

Q  Is there any other reason you'd send over
a million dollars to your real estate law firm?

A  No, I'm sure it's for the house.  I
just --

Q  Okay.

A  You're asking me -- I don't even look at
my bank statement now.  So I can't, under oath,
tell you --

Q  Okay.

A  But I assume it must have been because
that was what the purchase price was, roughly.

Q  Do you see in that box there where those
payments are referenced -- or those deducts are
referenced?  It says, purchased 625 Mass.  It's on
the far left side of that first rectangle.

A  Okay.

Transcript of James Courtovich
January 27, 2023                                             99

Q   Right?

A   Yup.

Q   So as far as --

A   Now, these other costs, you know -- you know, we're starting a renovation.  We had to hire an architect.  I'm sure it's all --

Q   All within that first section?

A   I can't -- I can't, under oath, say that's exactly what was it was for.  But I know what's that we were spending.

Q   Okay.  All right.  Well, we're going to go -- I mean, we're going to go through each -- we're going to go through each section, you know, one-by-one.  So this is purchase 625 Mass.  And then we'll go to the next as we flow the spreadsheet, okay?  And I'm going to ask you about each entry.

So what Ms. Clark is telling you here is on 3/9/2015, 4 million dollars went into account 3972, correct?

A   Correct.

Q   Right?  And then by the end of her

spreadsheet the amount left in the account was, as you look at the very bottom of the page, $1,909.25, correct?

A   Correct.

Q   Okay.  Great.  And that's the balance on 3/3/2018?

A   Correct.

Q   Correct?  So between 3/9/2015 and 3/31/18 the 4 million dollars was spent, correct?

A   Or transferred through --

Q   It's no longer in this account?

A   No longer in this account, correct.

Q   Spent, probably.  Or however you want to phrase it.  Okay.  So we're going to look at the second rectangle on this summary spreadsheet, which is page 2 of Exhibit 30.  And the first thing I see there is on -- looks like in June of '15 you transferred $1,500,000 to bank account 4881.  Do you see that?

A   Sure.

Q   And what does that transfer relate to?

A   I mean, we have SGR accounts, we have a

Sphere account, we have a few contacts under my name.  So --

Q   Let me -- let me turn your attention to the third page of Exhibit 30.  I think that provides you some more detail about the transfer. Do you see that?

A   Okay.

Q   All right.  So your testimony is what, as to what you were doing with that $1500 -- strike that -- $1,500,000?

A   Transferring it to another account.

Q   Right.  What is account 4881?

A   I don't know.

Q   Okay.  So this -- according to Ms. Clark's summary here, you withdrew 1,500,000 and then a couple months later you put back in 1,479,836.01?

A   I don't keep the books so --

Q   So you have no idea what that is all about?

A   No.

Q   All right.  But in essence, 15 -- 1.5 million goes in and 1.5 million comes back,

correct?

MR. DUNCAN:  A little less.

Q  A little less.

A  Yes.

Q  Yes.

A  So -- and I talked to Simon about this one.  I remember talking to him from Puerto Rico.  We, I believe -- and this is to the best of my memory -- put the money into a -- it was supposed to be put into a conservative fund.  And I got wrapped up in that whole Wells Fargo financial investors putting some of your money into their high risk accounts which they got bonuses for.  And so I pulled it all and put it back.  I think that's what it was.

Q  So you --

A  Except for the amount which we lost on the crappy investments.

Q  But you pulled it out and you put it back?

A  Yup.

Q  Yeah.  Okay.  Great.  And you see that -- again in the lower left-hand corner of -- of that

particular -- the second rectangle on the -- of her summary sheet of Exhibit 30, she says JC Wells -- WF investment account.  So that's what you're talking about, correct?

A  Yeah.

Q  Great.  Okay.  Terrific.  Okay.  Now I'm going to move to the third rectangle.  So before we get off that topic, so is it reasonable to glean from this document that 4881 is your investment account?  That's what she characteristics it as, here?

A  Okay.

Q  Okay.  All right.  Now we're going to go to the third rectangle.  And it looks like the way that Ms. Clark put this together is, as you can see from what's on the screen, the spreadsheet, there are itemized entries in each of the rectangle boxes.  And then, she's penciled in reference to the documents that support or relate to that particular transaction.

A  Mm-hmm.

Q  Right?  Okay.  So I'm going to go through

them one-by-one.  The first one she references is on 11/12/2016, a transfer of $200,000 from this account, 3972, to another account of yours, 0392, all right?

A   Mm-hmm.

Q   So let's look at B1.  All right.  So this is Courtovich production 815, right?

A   Mm-hmm.

Q   And this is the email from Ms. Clark, your CFO, right?

A   Correct.

Q   To you.  And it's telling you that she's taking 200K out of the 4 million fund that that relates to Woodland Drive, right?  And she's using it to pay bills, right?

A   Correct.

Q   Correct.  Okay.  So let me just ask you about a couple of these.  Hudson Studio, what is that in reference to?

A   Graphic designer.

Q   Graphic designer?

A   Yeah.

Q   Do you know what those expenses were for? No?

A   Business expenses.  I mean --

Q   Okay.  What about Gypsy Queen?

A   We did an event with a band called the Gypsy Queens.

Q   Okay.  Do you know who had the event?

A   I mean, we did.

Q   Who's we?

A   Sphere.

Q   Okay.  All right.

A   Or SGR.

Q   Well, was it Sphere or SGR?

A   It's the same people.

Q   Well, but you -- you --

A   There's no difference between Sphere and SGR, other than by name.  And we put our registered -- (indiscernible) registered accounts under SGR.  And then we have Sphere.  And it all has the same tax form.

Q   So in the -- in the term sheet that your counsel prepared and forwarded to Mr. Charlton

before you received the money you state, the founder shall make all commercially reasonable efforts to keep the business of SGR and Sphere separate from one another. All right. So they aren't all --

A Well, they're all the same employees. It's the same office.

Q Right. But --

A It's the same clients.

Q But do you deny --

A For example --

Q -- that the term sheet says that?

A For example, when --

Q Mr. Courtovich, I'm sorry. I asked you a question. Do you deny that the term sheets --

MR. DUNCAN: Actually, he was answering your question. Let him answer your question then ask your next question.

Q Yeah. Yeah.

A So for example, when the rift happened between us, Al Gosaibi or AHAB retroactively cancelled our contract 18 month in arrears. So

they see it -- and everyone saw it -- as the same.

Q   So --

A   They did that with Sphere.

Q   So I'm back to, again, asking you, didn't you make the representation that you were going to -- the founder shall make all commercially reasonable efforts to keep the business of the two entities separate from one another.

MR. DUNCAN:  What are you referring to, Andy?  I'm sorry.  You have --

MR. COOK:  Exhibit 4, page 2.

MR. DUNCAN:  Exhibit 4.  Give me a moment. This is the updated term sheet from February 2015 and --

MR. COOK:  This is Exhibit 4, page 2. It's Woodland Exhibit 3374.

MR. DUNCAN:  I just -- I'm saying the email is from February --

MR. COOK:  Oh, I'm sorry.

MR. DUNCAN:  -- 2015.

MR. COOK:  Yeah.  14 February 2015.

MR. DUNCAN:  Okay.  Just wanted to make

sure we have the same document.

MR. COOK:  Sorry, yeah.

MR. DUNCAN:  So that's a 2015 document and this is a 2018 document.

MR. COOK:  Yeah.  No question.  Right.

BY MR. COOK:

Q  So my -- your -- the term sheet that you forwarded to Mr. Charlton before you received the money makes that representation, correct?

A  Correct.

Q  Okay.  That's all I'm asking.

A  And everyone was aware that all of the employees were employees of Sphere but they worked on SGR accounts.  It was just the same office.  It was all one.

Q  But the 4 million dollar investment, was that -- was that for the benefit of Sphere or SGR?

A  Well, how do you separate that if all the employees are the same, the office is the same?  So when you're paying bills --

Q  So -- so I refer you back to Exhibit 2.  The reference is to SGR, correct?  Your first

paragraph, the remaining money, 2 million, will be used for salaries and operations for SGR, all right?

MR. DUNCAN:  You're talking about the December 4th --

MR. COOK:  I'm sorry.

MR. DUNCAN:  -- 2014.

MR. COOK:  Exhibit 2.  Yeah, right at the top.

MR. DUNCAN:  Okay.

MR. COOK:  It's the December 4, '14 email where he makes reference to SGR, correct?

BY MR. COOK:

Q  Your exhibit -- I'm sorry.  Exhibit 4, which is the term sheet that was forwarded to you or that you forwarded -- you had forwarded -- it was forwarded to you and to Simon on February 14, 2015, references SGR, correct?

A  Correct.

Q  So the -- the Woodland Drive agreement was SGR, Woodland, correct?  Not Sphere?

A  Correct.

Q  Right.  Okay.  Okay.  So I want to go back to -- so this is -- this is your production of -- it's page -- your production 815.  You're both looking at it, good.  There's a reference there to 147,701.78.  Do you see that, Sandy Spring?

A  Correct.

Q  What is that --

A  That was for the renovation of the Hill house.

Q  Okay.  That's great.  All right.  The next entry is D.C. 2010, $19,896?

A  No idea.

Q  Okay.  Could that pertain to a 2010 D.C. tax obligation?

MR. DUNCAN:  It could pertain to anything. I'm not quite sure what --

MR. COOK:  Okay.  All right.

A  And so --

Q  That's fine.  I'll go through it page by page.

A  So now -- so this has the 200,000.  We also had income from a host of other clients

coming in.  So this -- well --

Q  Mr. Courtovich, she's telling you that she's taking $200,000 out of the account number which she specifically identifies for you --

A  Sure.

Q  -- as 3982?

A  But she didn't tell me what -- she didn't tell me what the balance on the account was that she put it into.

Q  She -- she -- that -- that --

A  That does matter.

Q  For our purposes that doesn't matter.

A  Well, for my purposes it does.

Q  Well, of course.  Of course.  But -- well -- exactly.  So -- sorry.  We were talking.  Brett and I.  The point is, you asked for this -- you asked Kimberly to put this spreadsheet together.  And specifically you say, I think we need the details on where the money went, payroll, et cetera.  And she gives you a spreadsheet and detail disbursements, right?

So one of the documents that she provides

is identified in her spreadsheet as B1.  And she's saying that she's taken $200,000 out of account 3972, right?  To pay $13,000 for IRS 2013 monthly payment, right?

A  But what I don't know is what she had in that account beforehand.  So I don't have a cash flow --

Q  Which account?

A  Whichever account this is.

Q  What does it -- what does it matter?  She's telling you -- my question is, why are you using the money, any of the money -- any of the 4 million dollars --

A  Well, I refuse that.  Because we had other income.  So this is apples and oranges, right?  If we have income coming in and we're paying bills out, how do we say, well, this actually came from the Ciercos, this came from -- this came here, this came here, right?  It all gets dumped in and people get paid out.

Q  It's much simpler than that.  She's telling you right here where the money she took --

she's telling you, I'm taking $200,000 out of $3974 -- 72 --

A  I've answered.

Q  What?

A  I've answered that question.

Q  Well, but -- but I'm asking you is --

A  You're trying to make a point and I'm telling you, we have income coming in from all different sources, okay?  We pay bills.  Now, however she wrote this up, she wrote it up.  But bottom line is, we have other sources of income which we pay our bills.  And you can't, you know, say, well, this came from here and this came from here.  Because it all gets put in a pot.

Q  That's not what she's saying here.  She's telling you --

A  If she miswrote that, that's fine with me. But if you're saying we don't have 2 million dollars worth of bills to show, that we put into our business, you're sadly mistaken.

Q  What I'm focusing on --

A  You're trying to exaggerate a document

that was probably miswritten that doesn't take into account anything else that was going on at that time.

Q   All I'm asking is -- or all I'm addressing is $200,000 that she's telling you -- Kimberly Clark is telling you that I'm taking it out of the Woodland Drive account, basically, and I'm using it to pay -- she -- she --

A   You can keep saying it and I can keep repeating.

Q   Let me finish my statement.  She's telling you -- she's showing you here to the penny what she's using the money for, correct?  Right?  She -- she's telling you, I'm transferring $200,000, correct?  It matches up with the spreadsheet.

A   Okay.

Q   And she's telling you what she --

A   And I'm telling you we have other sources of income.  So however she wrote this matters not if you do a forensic look at the accounting.  Sorry.

Q   Mr. Courtovich, we, in our discovery,